No. 68,240

STATE OF KANSAS, *Appellee*, v. JOHN R. CADY, *Appellant*.

(867 P.2d 270)

Opinion filed January 21, 1994.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Paul J. Morrison*, district attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is a direct appeal of a conviction of murder in the first degree, after the first conviction had been reversed by this court in *State v. Cady*, 248 Kan. 743, 811 P.2d 1130 (1991) (*Cady I*). On appeal, defendant claims that double jeopardy barred retrial and there was not substantial competent evidence to support the finding his confession was made knowingly and voluntarily.

## The first trial

Cady, 16 years old at the time of the offense, stabbed and killed his girlfriend. Cady turned himself in, waived his *Miranda* rights, and made several statements, including a videotaped confession. The videotaped confession was admitted into evidence at his trial. Cady was convicted of first-degree murder and then appealed, claiming: (1) he should have been tried as a juvenile; (2) an instruction on diminished capacity should have been given; and (3) prosecutorial and juror misconduct violated his right to a fair trial. This court found no error on the first two grounds but reversed Cady's conviction due to prosecutorial misconduct.

The prosecutors' misconduct started on the second day of the first trial, during a recess. A police detective, who was assisting the prosecutors, overheard a juror remark; " 'That son-of-a-bitch [Cady] is guilty as hell.' " The detective immediately informed the prosecutors of the remark. One prosecutor stated to the detective such conduct would require a mistrial. The prosecutors, however, took no immediate action.

The next day, after the jury began deliberations, the prosecutors, without the presence of the defendant or his counsel, informed the judge of the juror's statement. The judge allowed the jury to continue deliberations and, without informing the defense of the problem, asked if either party objected to discharge of the alternate jurors. The defense agreed the alternates could be discharged. The jury subsequently found Cady guilty of first-degree murder. After the jury was excused, the judge informed the defense counsel of the juror's remark, but the record was unclear whether the trial judge thought the defense had already been made aware of the problem. Cady moved for a new trial on grounds of juror and prosecutorial misconduct, but his request was denied. On appeal, we found the prosecution had violated Cady's right to a fair trial by failing to inform the defense it knew of possible juror misconduct, and we reversed the conviction.

*The second trial*

The following evidence was admitted at the second trial: Cady had been dating Melissa Brown. Melissa's parents had told her she had to stop seeing Cady. The day before the homicide, Melissa broke up with Cady. Melissa told a teacher at her high school that Cady had threatened to kill her. Cady's anger at Melissa escalated, and he erupted and ended up being expelled from school. On the day in question, Melissa's stepfather, after arriving home from work, heard Melissa scream. He went to the bedroom. He saw Cady holding his stepdaughter with one hand and holding a knife in the other hand. The stepfather asked what Cady was doing. Cady replied, "This is what I am here for." Cady then stabbed Melissa. The stepfather ran downstairs to get his gun and to call the police.

Cady, covered with blood, ran from the house and went to a nearby residence. He told someone at the residence that he had

just killed his girlfriend. Cady used the phone to call a family friend and stated over the phone that he had just killed his girlfriend.

A detective responded to the call. Cady walked up to the detective and said he was the one the police were looking for. He told the detective he had just stabbed his girlfriend. Cady was arrested and advised of his constitutional rights as required by *Miranda*. Cady stated that he understood his rights. Cady was taken to the police station and again advised of his constitutional rights. After signing a waiver of rights form, he again confessed. This confession was videotaped and admitted into evidence.

At trial, Cady testified in his own defense. He stated that after the incident at school, he decided to run away to California with Melissa. He took the knife to protect himself and Melissa if anyone tried to stop them. After Melissa's sister let him in the house, he stayed to wait for Melissa. When he heard Melissa's stepfather come into the house, Cady hid in Melissa's bedroom closet. After Melissa came into the room, Cady opened the closet door. Melissa screamed and began to fight Cady. As Cady attempted to calm Melissa down, she grabbed the knife and it went into her shoulder. Cady stated that Brown's stepfather then came into the room and asked him what he was doing.

Cady testified that at this point he saw Melissa was in great pain and she had a puzzled look. He testified that he knew that his girlfriend could not "comprehend what had just happened," so he continued to stab her in the chest. Cady then stated that he had intended to commit suicide but when he heard the police sirens he left the Browns' house. On cross-examination, Cady admitted that he had killed Melissa by stabbing her several times. Cady knew who he had killed and that what he had done was wrong.

## I. DOES DOUBLE JEOPARDY BAR RETRIAL?

The Double Jeopardy Clause of the United States Constitution protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 53 L. Ed. 2d 187, 97 S. Ct. 2221 (1977). The language of § 10 of the Kansas Constitution Bill

of Rights is very similar to the language contained in the Fifth Amendment to the United States Constitution. Both provide in effect that no person shall be twice placed in jeopardy for the same offense. The language of the Fifth Amendment guarantees no greater protection to an accused than does § 10 of the Kansas Constitution Bill of Rights. Therefore, the underlying protection contained in the Double Jeopardy Clause of the United States Constitution is contained in § 10 of the Kansas Constitution Bill of Rights.

In order to implement and define the constitutional guarantees against double jeopardy, the Kansas Legislature enacted two statutes: (1) K.S.A. 21-3107, multiple prosecutions for the same act; and (2) K.S.A. 21-3108, effect of former prosecution. K.S.A. 21-3107 defines the right of the prosecution to charge more than one offense based on the same act and to convict of an included offense not specifically charged. It formulates the limitations upon unfair multiplicity of convictions and prosecutions. K.S.A. 21-3108 attempts to cover the complex problems of former jeopardy. *State v. Freeman*, 236 Kan. 274, 281, 689 P.2d 885 (1984).

Cady acknowledges that reversal of a conviction does not automatically bar retrial, particularly when the retrial results from a defendant's request for mistrial. Cady contends, however, that when the mistrial is caused by prosecutorial misconduct which provokes a defendant into requesting the mistrial, double jeopardy bars retrial. Cady asserts that although reversal of his first trial (*Cady I*) did not involve a mistrial, he was unable to request a mistrial but was required to move for a new trial in the district court because he was not informed of the juror's remark until he had been convicted and the jury had been excused.

Cady admits his trial counsel never raised the issue of double jeopardy to the trial court in his second trial. Cady argues that even though a double jeopardy claim was not raised in the district court, this is an issue of constitutional magnitude, a question of law, and, in the interest of judicial economy, his claim of double jeopardy should be considered in this appeal rather than in a separate K.S.A. 60-1507 action claiming ineffective assistance of counsel.

The State argues Cady's failure to raise the double jeopardy claim at trial waives that defense, citing *Cox v. State*, 197 Kan.

395, 416 P.2d 741 (1966). Cox had been tried and convicted, and his conviction was reversed; prior to retrial, he pled guilty. While in the penitentiary, Cox filed a motion in the district court that collaterally attacked his conviction on double jeopardy grounds. The district court found the prohibition against double jeopardy had been violated and vacated the sentence. The State appealed. The *Cox* court reversed the district court, noting that the defendant had failed to affirmatively raise the defense of double jeopardy in his original appeal, and after his conviction had been reversed on other grounds he entered a plea of guilty to a lesser included offense. The *Cox* court noted that even if double jeopardy was raised as a defense, it was abandoned by a subsequent plea of guilty. See *State v. Carte,* 157 Kan. 673, 143 P. 2d 774 (1943). It determined that either action by Cox constituted a waiver of the defense of double jeopardy under prior decisions of both Kansas and federal courts.

We agree that issues may be raised on appeal for the first time where consideration is necessary to prevent a denial of fundamental rights. See *State v. Puckett,* 230 Kan. 596, 601, 640 P.2d 1198 (1982). In *State v. Dubish,* 234 Kan. 708, 718, 675 P.2d 877 (1984), the issue raised for the first time on appeal was whether a conviction was multiplicitous. This court specifically noted that allowing a multiplicitous conviction to stand violated Dubish's fundamental right to a fair trial. Neither *Puckett* nor *Dubish* control, but to prevent a future claim that ineffective assistance of counsel denied Cady his fundamental right not to be placed twice in jeopardy, we will consider the issue.

Both sides cite as authority for their position *Oregon v. Kennedy,* 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083 (1982). Kennedy had been charged with theft. A series of sustained objections prevented the prosecutor from eliciting certain testimony. The prosecutor returned to the well one more time and asked the witness if the reason he had never done business with the defendant was because the defendant was a crook. The court granted the defendant's motion for a mistrial. Prior to his second trial, Kennedy unsuccessfully.argued to the trial court that double jeopardy barred retrial. He was retried and convicted. He appealed that conviction. The Oregon Court of Appeals found the double jeopardy protection of the United States Constitution

barred his retrial because the prosecutor's conduct in the first trial was "overreaching."

The United States Supreme Court reversed the Oregon Court of Appeals and remanded for further proceedings, but noted there is a narrow exception to the general rule that where the defendant requests the mistrial, double jeopardy does not bar a subsequent retrial. It held that double jeopardy only bars retrial, after a request for mistrial by the defendant is granted, where the prosecutor has intentionally provoked the defendant's request for mistrial.

Citing *U.S. v. Rios*, 637 F.2d 728, 729 (10th Cir. 1980), *cert. denied* 452 U.S. 918 (1981), Cady argues the rule in *Kennedy* should be extended to cover situations where there is a reversal of a defendant's conviction by an appellate court due to prosecutorial misconduct. Cady contends the application of the rule should not depend on which court, *i.e.*, trial or appellate, reverses a defendant's conviction because of prosecutorial misconduct.

In *Rios*, the defendant's motion for mistrial was denied by the trial court, but that decision was reversed on appeal by the 10th Circuit. Although *Rios* was decided before *Kennedy*, the 10th Circuit recognized the exception to the general rule that a mistrial requested by the defendant does not bar a second trial under double jeopardy where the prosecutor provokes the defendant's request for mistrial, and determined that it made no difference in applying the rule whether the trial court or the appellate court granted the defendant's motion for mistrial. The 10th Circuit affirmed Rios' conviction, however, because there was no intent by the prosecutor to provoke Rios' request for a mistrial.

*Kennedy* applies to situations where the defendant's request for mistrial was inevitable because the prosecution subverted the defendant's right to a fair trial. Applying *Kennedy* to our factual situation, we find the prohibition against double jeopardy does not apply because *Kennedy* requires that the prosecution intended to goad the defendant into seeking a mistrial. The record in *Cady I* indicates the prosecution was aware the juror's remark could be grounds for a mistrial if brought to the attention of the judge. There is no evidence the prosecutors intentionally influenced the juror, thus provoking Cady to request a mistrial.

The constitutional interest protected by *Kennedy* is that a defendant should be allowed to freely choose whether he or she should request a mistrial and forego the right to have the matter decided by the first trier of fact. Where the prosecutor seeks to force the defendant into the choice, the choice is not freely made, and the prosecution has subverted the defendant's rights protected by the Double Jeopardy Clause of the Constitution.

It is incumbent on the appellant to furnish a record to support the claim of error. *State v. Richard*, 252 Kan. 872, 874, 850 P.2d 844 (1993). Nothing in the record on appeal supports a conclusion the prosecutors intended to provoke a mistrial in the first trial; therefore, double jeopardy does not bar Cady's second trial and conviction.

## II. CADY'S VIDEOTAPED CONFESSION

Cady claims the trial court erred by admitting his videotaped confession into evidence at the second trial because he did not knowingly and voluntarily waive his rights under *Miranda*. Although the tapes had also been admitted at the first trial, that issue was not raised in the appeal of *Cady I*. Cady objected to the admission into evidence of the videotapes at the second trial.

The State, citing *State v. Neer*, 247 Kan. 137, 795 P.2d 362 (1990), contends that after a remand issues not raised in the initial appeal are waived in any subsequent appeals. In *Neer*, after being convicted of aggravated criminal sodomy, Neer was sentenced by the district court. He appealed only his sentence. We affirmed the sentence imposed. Neer's subsequent motion to the district court to modify the sentence was denied. Neer then appealed the denial of his motion to modify and also sought reversal of his conviction for aggravated criminal sodomy, claiming that the evidence was insufficient.

Neer had not raised the evidentiary issue before the trial court or in his first appeal. The State argued Neer's sufficiency of evidence issue was not properly before the appellate court because he had failed to raise that issue at trial and in his first appeal. We noted that the general rule in Kansas is that piecemeal appeals are frowned upon. 247 Kan. at 140 (citing *State v. Newman*, 235 Kan. 29, 31, 680 P.2d 257 [1984]). We acknowledged that a point not raised before, or presented to, the trial court

cannot be raised for the first time on appeal. 247 Kan. at 140 (citing *State v. Heck*, 8 Kan. App. 2d 496, 502, 661 P.2d 798 [1983]).

We determined that for Neer to appeal his original conviction for aggravated criminal sodomy, he must do so within 120 days of the imposition of sentence plus the 10 additional days granted under K.S.A. 22-3608(1). Neer had 130 days from the day he was sentenced to appeal the conviction. See *State v. Tripp*, 237 Kan. 244, 246, 699 P.2d 33 (1985). More than 130 days had expired between Neer's sentencing and his appeal. We found under Kansas law, where an appeal is taken from the sentence imposed and/or a conviction, the judgment of the reviewing court is res judicata as to all issues actually raised. Those issues that could have been presented in the appeal, but were not presented, are deemed waived. Where a defendant's claim has not been raised at trial or on direct appeal, such a default prevents the defendant from raising the claim in a second appeal or a collateral proceeding.

Cady asserts the State's contention that this issue has been waived is an unwarranted expansion of *Neer*. Cady claims that *Puritan-Bennett Corp. v. Richter*, 235 Kan. 251, 679 P.2d 206 (1984), requires a different result than *Neer* under the circumstances of this case. That case involved restrictive covenants in a contract of employment. The trial court found the covenants reasonable. An appeal was taken but not from that ruling. The Court of Appeals reversed and remanded on the issues appealed. After the trial court ruled on remand, the matter was again appealed. The second appeal challenged the reasonableness of the restrictive covenants. Although failing to raise an issue generally bars review, this court found the issue of reasonableness was not relevant in the initial appeal and the issue could be raised after remand in the second appeal.

Cady argues that reversal of his first conviction "re-cloaked" him with the presumption of innocence and a refusal to review an error that occurred in the second trial would be unfair. Cady asserts adoption of the State's interpretation of *Neer* would, to preserve an issue for a possible second appeal, require the defendant to raise every issue possible, no matter how weak, in the initial appeal.

We disagree with the State's analysis of *Neer*. *Neer* does not state that failure to raise an issue in the first trial or on appeal bars raising the same issue that also arises in a subsequent trial. Under the circumstances of this case, the issue whether or not it was error to admit the videotaped confession into evidence is properly before us on appeal and can be addressed.

At a pretrial hearing before the first trial, Cady claimed he had not knowingly and voluntarily waived his right to remain silent prior to making the videotaped confession to the police. The trial court overruled Cady's objection to the admission of his videotaped statement. To support suppression of that statement, Cady relies on the totality of the circumstances surrounding the confession and not on evidence adduced at the suppression hearing. Cady contends that "[i]n light of [his] age and severe mental condition, it cannot be said" the confession was made knowingly and voluntarily.

In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held the prosecution cannot use statements, whether inculpatory or exculpatory, stemming from custodial interrogation, unless it proves that procedural safeguards were used to secure the defendant's privilege against self-incrimination. These safeguards include informing the person in custody, prior to interrogation, of his or her Fifth Amendment rights to remain silent, to consult with an attorney, and to have an attorney present during interrogation. Further, if the person in custody states that he or she wants an attorney, all questioning must cease until the attorney is present. 384 U.S. at 444-45. *State v. Leroy*, 15 Kan. App. 2d 68, 70, 803 P.2d 577 (1990).

In determining whether an accused's confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent

evidence. *State v. Perkins*, 248 Kan. 760, 764, 811 P.2d 1142 (1991).

In support of his claim, Cady points to the fact that he was 16 at the time he gave the statement. He had previously been diagnosed by Dr. Sweetland, a clinical psychologist who evaluated Cady's competency to stand trial, as schizophrenic. It was Sweetland's opinion that the "slight rocking behavior" Cady exhibits in the videotape of his confession indicated a deep emotional disturbance. Sweetland also testified there was "tremendous disparity" in Cady's intelligence test scores in particular sections, which clearly indicated Cady's education was seriously disturbed by emotional disturbances and learning disability. Cady's overall I.Q., however, was 93, which is within the average range. Sweetland opined Cady's original Rorschach testing gave very clear indications of psychosis. The second test still showed mental illness but not to the extent of the first one. Sweetland also stated the Minnesota Multiphasic Personality Inventory test strongly pointed to psychosis. Sweetland concluded Cady was a very disturbed young man and had been for "many, many years." Sweetland testified, in his observation of the videotaped confession: "[Cady] was quite frightened, was drawn in to providing information, certain types of information from the police officers, eager to cooperate . . . ."

It was also Sweetland's opinion that at the time of the homicide Cady was psychotic and had been hallucinating. Because of his emotional disturbances, his lack of sleep at the time of the homicide, the incident the previous day at the school, and Cady's fear of losing his girlfriend, Sweetland testified Cady's judgment was "blurred" and that Cady acted "out of complete primitive psychosis, not out of reason and judgment." In addition to Sweetland's testimony, a school administrator testified Cady was in a learning disabled class. Cady's father also testified that Cady suffered from oxygen deprivation at birth which resulted in a minimal brain disorder and that Cady had been held back in both kindergarten and first grade.

Due to Cady's difficulties in his relationship with Brown, he had been temporarily hospitalized and lithium had been prescribed for his schizophrenic and manic-depressive tendencies. At the time of the homicide, Cady was on lithium and was also

taking anabolic steroids. The steroids were not prescribed by any physician. Cady had also previously complained to his father of being able to feel germs crawling on his body, and the father testified Cady would take as many as three showers a day in response to this feeling. The day of the incident at the school, after Cady's father took Cady home, Cady told his father he had also been hearing voices.

Dr. Vandenberg, a clinical and forensic psychologist, was called by the State as a rebuttal witness. Vandenberg only spent about one and one half hours with Cady and did not do any testing. He found Cady to be manic-depressive with schizo typal features. Schizo typal individuals are odd or eccentric but are not schizophrenic. Vandenberg opined Cady was not insane at the time of the homicide. Vandenberg's conclusions were drawn by reviewing the existing reports and the observations by other persons involved. It should also be noted the videotaped interview began about 20 minutes after the killing.

Cady asserts this court's standard of review is de novo, citing *Fulminante v. Arizona*, 499 U.S. 279, 113 L. Ed. 2d 302, 315-16, 111 S. Ct. 1246 (1991). That case noted the United States Supreme Court "normally give[s] great deference to the factual findings of the state court[s]" but that the " 'ultimate issue of "voluntariness" is a legal question requiring independent federal determination.' " The State contends that if the issue is addressed, the standard of review is whether substantial competent evidence supports the trial court's determination that a statement is admissible because it was knowingly and voluntarily given, citing *Perkins*, 248 Kan. 760.

The State also acknowledges that while mental condition is relevant, it is only one of several factors to be considered. Those additional factors include the "duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation." *State v. William*, 248 Kan. 389, 409, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991).

There is substantial competent evidence to support the trial court's conclusion that Cady made his confession knowingly and voluntarily. Vandenberg opined that at best Cady was only manic-

depressive. Cady's I.Q. was in the average range, and the police officers stated Cady's responses to their questions when they arrested him were rational.

An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

Even if we assume the trial court erred in admitting Cady's confession, there is no reversible error if, in the light of other evidence adduced, it would not have changed the outcome of the trial. In addition to the confession, there was testimony that Cady made voluntary inculpatory statements to bystanders and the police officers prior to his arrest. The stepfather testified he saw Cady stab the victim. At trial, Cady testified he stabbed his girlfriend and claimed he was insane. He testified to support his defense of insanity, not in response to the admission of his videotaped statement. If there was any error in admitting the videotaped confession, it was harmless.

Affirmed.