No. 73,406

STATE OF KANSAS, *Appellee*, v. ROY L. JENSEN, *Appellant*.

No. 73,467

STATE OF KANSAS, *Appellant*, v. ROY L. JENSEN, *Appellee*.

No. 73,578

STATE OF KANSAS, *Appellant*, v. HOWARD SCOTT SIMPSON, *Appellee*.

(915 P.2d 109)

Opinion filed April 19, 1996.

*Michael S. Holland*, of Russell, argued the cause and was on the briefs for appellant/appellee Roy L. Jensen and appellee Howard Scott Simpson.

*Glenn R. Braun*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee State of Kansas, and *Scott J. Miller*, assistant county attorney, was with them on the brief for appellant State of Kansas.

*Brian Cox*, of Topeka, was on the briefs for *amicus curiae* Kansas Department of Revenue.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The State of Kansas appeals from the district court's dismissal of possession of marijuana charges in two separate criminal cases in which the court held the prosecution would con-

stitute double jeopardy. Jensen appeals from his conviction of possessing marijuana without paying the drug tax and the denial of his motion to suppress the evidence seized from a search of his residence. The cases have been consolidated on appeal.

Two issues are raised in this consolidated appeal:

1. Should the evidence seized from Jensen's residence have been suppressed because the warrant-issuing judge was misled by the informant's testimony?

2. Does assessment and partial or complete satisfaction of tax and penalty under the Kansas Drug Tax Act, K.S.A. 79-5201 *et seq.*, bar subsequent criminal prosecution on a charge arising from possessing the drug?

Jensen filed a motion to suppress evidence obtained during execution of a search warrant at his residence. A hearing was conducted, and the district court filed a written decision denying the motion. At the urging of Jensen, the district court clarified its earlier decision by filing findings of fact and conclusions of law in formally numbered paragraphs. The findings of fact were as follows:

"1. On June 22, 1993, David Zellmer, a Sheriff's Deputy and a member of the Ellis County Drug Enforcement Unit was called out of a meeting to talk to a man by the name of Robert Kiehl.

"2. Deputy Zellmer did not know Kiehl well, and had only met him once before, approximately two weeks prior to June 22, 1993. On this earlier occasion, Detective Tom Meiers of the Hays Police Department asked Zellmer to take Kiehl home in an unmarked car. Kiehl was a witness in an investigation being carried on by Detective Meiers. This investigation was unrelated to any of the matters presented in the above captioned case.

"3. During the course of the June 22, 1993 conversation, Kiehl told Zellmer that Roy Jensen was selling marijuana and growing it in Jensen's home. Kiehl further stated that he had been to Jensen's home with Chad Weilert, and that Weilert had purchased $200.00 or $250.00 worth of marijuana from Jensen. At this time, Kiehl stated that he saw 50 to 100 marijuana plants in Jensen's basement, and described the conditions under which these plants were being grown.

"4. On the morning of June 23, 1993, Deputy Zellmer had Kiehl appear at the Ellis County Law Enforcement Center. Zellmer interviewed Kiehl. During this interview, Kiehl gave an accurate description of Roy Jensen, with whom Zellmer was acquainted. Kiehl also described certain vehicles which belonged to Jensen, described Jensen's home, and the general area in Hays, Kansas where the Jensen home was located. Kiehl did not know the street address of the Jensen home.

"5. Zellmer, in an effort to corroborate Kiehl's story, put Kiehl in Zellmer's vehicle, with Zellmer driving, and asked Kiehl to direct him to the Jensen home. Kiehl did so, and Deputy Zellmer was able to observe the Jensen home, which matched Kiehl's previous description. The motor vehicles previously described by Kiehl were at the Jensen residence.

"6. At some point in time after the June 22, 1993 conversation between Deputy Zellmer and Kiehl, Zellmer contacted Detective Jim Braun of the Hays Police Department, also a member of the Ellis County Drug Task Force. Braun was asked by Zellmer to assist in the investigation.

"7. Additional means of corroborating Kiehl's story were considered. Detective Zellmer considered checking Jensen's city water bill and his electric bill to determine whether water and electricity consumption were consistent with a marijuana growing operation. Investigation determined that Jensen had a water well at his home, and therefore city water usage information was unavailable or would not be reliable. Midwest Energy, which supplies power utilities to Jensen's home, would not release power consumption information without a warrant.

"8. Deputy Zellmer and Detective Braun decided that Kiehl should personally appear before Judge Tom Scott of the Ellis County District Court, as neither officer knew Kiehl well, and they were unable to find any additional corroboration for his story. The officers desired that Judge Scott be able to see and hear Kiehl's testimony, and be able to reach his own conclusions about Kiehl's reliability.

"9. Kiehl appeared before Judge Scott on June 23, 1993 and gave testimony under oath in support of an application for a search warrant authorizing a search of Jensen's home. A search warrant was issued by Judge Scott on that date.

"10. As a result of a search of the Jensen home under authority of the warrant, marijuana and paraphernalia were found; however, no growing marijuana was found in the basement of the Jensen home. The only growing plant that was recovered as a result of the search was a plant growing in the back yard of the Jensen residence.

"11. As a result of items found in the search conducted, Jensen was charged in this case.

"12. Robert Kiehl was not at any time relevant to this case a law enforcement officer or government employee. He was not acting at any time relevant hereto on behalf of any governmental agency, or in any capacity, or under any circumstances by virtue of which his actions could be considered governmental action.

"13. Neither Deputy Zellmer nor Detective Braun knew or had reason to know of any matter in Kiehl's background which would cast doubt on his veracity or reliability, including, but not limited to, any knowledge of mental disease, disability or treatment history.

"14. The two officers did not tell Judge Scott, at the time the application for search warrant was being considered, that they had attempted to corroborate Kiehl's testimony through water and electricity bills.

"15. Defendant filed a motion to suppress the evidence seized in the search on the basis that the testimony of Kiehl in support of the search warrant was perjured.

In support of this motion, defendant attached the sworn testimony of Chad Weilert and the affidavit of Roy Jensen.

"16. The law enforcement personnel who executed the search warrant, and all officers connected with the warrant and the search did so in good faith reliance upon the search warrant."

The record on appeal also reveals the following facts pertaining to the search of Jensen's residence:

The application for search warrant is dated Wednesday, June 23, 1993, at 10:34 a.m. Detective Jim Braun was the affiant. In the space for attested facts upon which the application is based, there is only the notation, "(oral affidavit)." The "oral affidavit" was made when Detective Braun was sworn in and Kiehl and Deputy Zellmer gave sworn testimony in the presence of a district judge. Questions were asked of them by the county attorney.

Kiehl stated that he had gone to Jensen's residence on Saturday, June 19, with Chad Weilert. Kiehl said that they went there because Weilert wanted to spend approximately $200 to $250 for a bag of marijuana. Inside the house, Jensen told Weilert that he had a bag for him and asked Weilert to go downstairs. There Kiehl saw Jensen hand Weilert a sandwich bag of marijuana.

Kiehl also described seeing 50 to 100 marijuana plants in containers. He estimated the plants to be "[o]ver a foot," "maybe thirteen, fourteen" inches, and between 1 and 2 feet. Each plant was individually potted, and there were lights around the plants.

Kiehl testified that he had not been promised anything in exchange for the information about Jensen, that his giving the information was completely voluntary, and that he had no personal animosity toward Jensen.

There was little in Kiehl's brief testimony from which the judge who issued the search warrant reasonably could have drawn conclusions about his trustworthiness. Kiehl said he had lived in Ellis County approximately 2 or 3 years, he knew Jensen, Jensen's house, and Jensen's vehicles, he used drugs until approximately 6 months to a year before the hearing, he contacted Deputy Zellmer "about another situation in regards to a girl that I live with, in regards to an incident that she pulled in Wichita," and he might be a witness in another case in which he was working with Detective Meiers.

Deputy Zellmer testified that his only contact with Kiehl before June 22 was when he had spent about 5 minutes driving Kiehl home in an undercover vehicle at the request of Detective Meiers. Zellmer also testified that he had understood from Kiehl that he had been in Jensen's basement on Monday evening rather than on Saturday. And finally, Zellmer stated that Kiehl's description of the lights in Jensen's basement was "somewhat vague."

No marijuana plants were found in the house. In the back yard three 6-inch marijuana plants were found in two styrofoam cups. No lights or lighting equipment were found. The search did yield marijuana in brick form in a quantity greater than would be presumed to be for personal use, paraphernalia, scales, plastic bags, and marijuana buds and seeds.

There is no dispute about the facts pertaining to the double jeopardy issue for either Jensen or Simpson. With regard to Jensen, the district court stated:

"On June 23, 1993, pursuant to a search warrant issued out of this Court, officers of the Ellis County Drug Task Force searched defendant's home. A quantity of marijuana was found and seized, resulting in the present charges. (See Affidavit in Support of Search Warrant). On July 9, 1993, The Kansas Department of Revenue, Division of Alcoholic Beverage Control, Drug Tax Administration issued a Notice of Assessment of Tax Upon Marijuana and a Controlled Substance.

"The Notice states that the KDR has levied a tax upon the marijuana seized of $9,975.00, based upon the statutory tax rate of $3.50 per gram or portion thereof. In addition, the Department assessed a 100% penalty. The total tax due as stated in the Notice is $19,950.00, and a tax warrant was issued for that amount. The tax warrant is also dated July 9, 1993. (See Defendant's Exhibits 1 & 2).

"The parties have stipulated that a sum in excess of $18,000.00 has been seized by KDR from defendant's bank account under the tax warrant, in substantial satisfaction of the tax and penalty due."

With regard to Simpson, the district court stated:

"On May 2, 1994, the defendant was stopped by officers of the Hays Police Department for operating a vehicle with an expired license tag. While at the scene of the stop, officers looked through the window of the defendant's pickup and, with the aid of a flashlight, saw a large bag of what appeared to be marijuana. Defendant was arrested and charged with three counts of violation of the law: Count I, possession of marijuana upon which a tax is imposed without a stamp affixed proving payment of the tax in violation of K.S.A. 79-5204 and 5208; Count II, possession of marijuana with intent to sell in violation of K.S.A. 65-4127b as

amended; and Count III, driving [an] unregistered vehicle in violation of K.S.A. 8-142.

"On May 16, 1994, The Kansas Department of Revenue, Division of Taxation issued a Notice of Assessment of Tax Upon Marijuana and a Controlled Substance. The Notice states that the KDR has levied a tax upon the marijuana seized of $7,840.00, based upon the statutory tax rate of $3.50 per gram or portion thereof. In addition, the Department assessed a 100% penalty. The total tax due as stated in the Notice is $15,680.00, and a tax warrant was issued for that amount. The tax warrant is also dated May 16, 1994. The parties have stipulated that a motorcycle belonging to the defendant has been seized by KDR under the tax warrant, in partial satisfaction of the tax and penalty due."

We first consider if the evidence seized from Jensen's residence should have been suppressed due to the warrant-issuing judge's having been misled by the informant's testimony. Jensen contends that the warrant to search his house was improperly obtained. His theory starts with the premise that he established at the hearing on his motion to suppress that most material statements in the affidavit were false. He contends that Kiehl, the one who made the false statements, was a government agent and that the State failed in its duty to provide information bearing on his credibility to the judge who was reviewing the warrant application. It is Jensen's position that what remains of the affidavit after false statements are removed is insufficient to establish probable cause for issuance of the search warrant.

The State contends that findings of the district court control for the purpose of this review. The district court conducted a hearing on Jensen's motion to suppress at which the defendant presented evidence which tended to undermine the credibility of all aspects of Kiehl's testimony. After studying authorities cited by the State, the district court concluded that no hearing should have been conducted. It concluded that, because Jensen had failed to show that Kiehl was a government agent, the affidavit could not be impeached. In the words of the district court, "[t]he defendant is, therefore, not entitled to a finding by this court as to the truth or falsity of Kiehl's testimony in search of the warrant." In addition, the district court concluded that there had been no deliberate or reckless suppression of material fact by the police officers involved in obtaining the search warrant. Finally, the district court con-

cluded that the search was executed in good faith reliance on the warrant so that evidence seized during the search should not be suppressed.

Generally, a defendant may not dispute allegations in the affidavit upon which a search warrant was issued against him. *State v. Jacques*, 225 Kan. 38, Syl. ¶ 4, 587 P.2d 861 (1978). Following *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), this court created an exception to the general rule where the defendant's "attack is supported by allegations and an offer of proof under oath that the affidavit or application for search warrant contains material statements of deliberate falsehood or of reckless disregard for the truth." 225 Kan. 38, Syl. ¶ 5. Here, the district court's principal rationale in overruling Jensen's motion to suppress was that the exception, although not specifically stated in *Jacques*, was applicable if the material statements of deliberate falsehood or of reckless disregard for the truth *were made by a government agent*.

The State contends that the district court's interpretation of *Franks* and *Jacques*, although unexpressed in those cases, is intrinsic in those decisions. The State offers the rationale that the Fourth Amendment protects a criminal defendant against government misconduct but not against misconduct of a private citizen. The district court also noted that the exclusionary rule was "designed to deter investigatory agents of the government from violating constitutional mandates." This view was expounded in *State v. Moore*, 54 Wash. App. 211, 773 P.2d 96, *rev. denied* 113 Wash. 2d 1027, 782 P.2d 1071 (1989), which was quoted by the district court in its memorandum decision and is relied on by the State on appeal:

"A defendant is entitled to an evidentiary hearing upon making a 'substantial preliminary showing' that an officer or an agent of the State knowingly or recklessly made a false statement that was the basis of a court's probable cause finding. *State v. Thetford*, 109 Wn.2d 392, 398, 745 P.2d 496 (1987) (a/k/a a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154, 155, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978)). The theory behind the *Franks* hearing is that the government is never permitted to benefit from its own misconduct. The *Franks* hearing arose as an exception to the 'four corners' rule, which does not permit challenges to facially valid affidavits establishing probable cause. *See, e.g., United States v. Bowling*, 351 F.2d 236, 241-42 (6th Cir. 1965); Annot. 5 A.L.R. 394 (1949). The *Franks*

hearing was instituted to detect and deter the issuance of warrants based on information gathered as a result of governmental misconduct. *See Thetford*, at 399.

"If, however, a nongovernmental affiant provides testimony upon which a warrant is based and that testimony is later shown to have been intentionally false or gathered by means that would constitute a constitutional violation if done by a governmental agent, *Franks*, nonetheless, does not apply. *Thetford*, at 398; 2 W. LaFave, *Search and Seizure* § 4.4(b) (1987). *Franks* does not apply in such instances because there exists no governmental misconduct that could be detected or deterred by a *Franks* hearing." 54 Wash. App. at 214-15.

Applying the principle to the facts of its case, the Washington Court of Appeals stated: "Accordingly, to be entitled to a *Franks* hearing, appellant must establish by a 'substantial preliminary showing' (1) that [the informant] was a governmental agent, and (2) that [the informant] made false statements to the magistrate." 54 Wash. App. at 215. The Washington Court of Appeals found that Moore had established neither. *Moore*, as the ruling of an intermediate court of another state, is not controlling, but it is persuasive.

Although the *Franks* Court did not expressly limit the exception to an affidavit sworn to by a government agent, we agree with the State that it is intrinsic to the decision. In its holding, the *Franks* Court said: "The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." 438 U.S. at 171. The affidavit in support of the search warrant in *Franks* was sworn to by two police detectives.

In *Jacques*, we applied the *Franks* exception. However, the only reference to the identity of the affiant was "that the applicant who applied for the search warrant was lying because the name of the informant on which he relied was confidential and could not be discovered; therefore defendant alleged the informant never existed." 225 Kan. at 44. In *Jacques*, we state the general rule as "a party against whom a search warrant is directed may not dispute the matters alleged in the supporting affidavit or application." 225 Kan. 38, Syl. ¶ 4. However, following *Franks*, the exception to the general rule was applied in *Jacques*, and we concluded no hearing was required. 225 Kan. at 44.

The exception to the general rule applies only where the affiant is a government agent and the defendant's challenge is supported by sworn allegations that false statements made knowingly, intentionally, or with reckless disregard for the truth were included in the affidavit, and the false or reckless statement is necessary to the finding of probable cause. If the exception applies, then the defendant is entitled to a *Franks* hearing.

There is no contention in the present case that Kiehl was acting as an agent of the government when he visited Jensen's house. However, it is Jensen's theory that Kiehl was the affiant pursuant to K.S.A. 22-2502(a), which does not require affidavits supporting search warrant applications to be made by law enforcement officers. When Kiehl was called by the county attorney to testify before the magistrate, Jensen contends, he was an instrument of the government acting under the authority and direction of the State rather than independently. We do not agree.

Examination of the record discloses that the affiant actually was a law enforcement officer. The affidavit and application for search warrant form bears the signature of and identifies "Jim Braun, Hays P.D.," as the affiant. In the space for a recitation of facts on which the application is based appears the note "(oral affidavit)." The transcript of the sworn testimony begins:

"THE COURT: This is a hearing in Ellis County District Court in regard to an oral affidavit and application for search warrant. Detective Jim Braun will now take the oath. Do you solemnly swear to tell the truth, the whole truth and nothing but the truth, so help you God?

"DETECTIVE JIM BRAUN: I do.

"THE COURT: You may examine.

"MR. GLENN BRAUN [county attorney]: The first witness I am going to call, Your Honor, would be Robert Kiehl."

It ends with the judge asking, "Jim, do you want to sign this thing?" The "oral affidavit" took the form of Detective Braun's being sworn in and two witnesses, Kiehl and Deputy Zellmer, answering questions asked by the county attorney. The application in this case is not a typical written application supported by information provided by a confidential informant where reliability has been vouched for by the law enforcement affiant. Here, the officers did not verify

Kiehl's veracity or reliability. Instead, the officers suggested the lack of such verification and left it to the judge to determine. K.S.A. 22-2502(b) authorizes the magistrate to require precisely the procedure which was followed in the present case on the initiative of the police:

"Before ruling on a request for a search warrant, the magistrate may require the affiant to appear personally and may examine under oath the affiant and any witnesses that the affiant may produce. Such proceeding shall be taken down by a certified shorthand reporter or recording equipment and made part of the application for a search warrant."

The district court credited law enforcement officers with applying for the warrant in the manner in which they did for the purpose of providing to the warrant-issuing judge all available means of satisfying himself of Kiehl's reliability. The district court stated:

"The officers then, knowing that they had no previous knowledge of Kiehl and only a limited amount of corroboration for his story, took Kiehl before the issuing magistrate. The officers could not have done more. They put before Judge Scott everything they had, including their witness. . . .

. . . .

"Since the Court has found that the officers, in applying for the search warrant, and using Kiehl's testimony in support of the application, did nothing improper, the actions of the officers cannot give rise to a successful challenge to the testimony upon which the search warrant was based."

In this case, Kiehl's reliability was an unknown quantity to police, who avoided the issue by making no representations about it and having Kiehl testify before the magistrate. The magistrate could and should have questioned Kiehl and the officers in order to satisfy the intertwined requirement of the informant's reliability. Here, however, the issuing judge ignored the opportunity to elicit information on which an opinion of the informant's reliability could have been based. The few minutes in which Kiehl appeared to testify may have permitted the judge to form an initial impression of the informant as credible or not, but an impression based on appearance and demeanor cannot replace an opinion formed on facts. That failure lies with the issuing magistrate and not with the law enforcement officers. The district court correctly interpreted the *Franks* exception and did not err in denying a hearing.

We next consider the issue common to both cases: Does assessment and partial or complete satisfaction of tax and penalty under the Kansas Drug Tax Act bar subsequent criminal prosecution on a charge arising from possessing the drug? In 1994, the United States Supreme Court decided in *Montana Dept. of Rev. v. Kurth Ranch*, 511 U.S. 767, 128 L. Ed. 2d 767, 114 S. Ct. 1937 (1994), that Montana's drug tax was invalid under the Double Jeopardy Clause of the Fifth Amendment to the federal Constitution. Motions to dismiss charges were filed by defense counsel in the present cases based on application of the *Kurth Ranch* holding. In its memorandum opinion, the district court stated the double jeopardy issue raised by Jensen and Simpson as follows: "Does the Kansas drug tax, like that of Montana, constitute punishment and therefore prohibit a second punishment of the defendant through these criminal proceedings?" The district court concluded that the Kansas tax was punitive in nature. Accordingly, it granted the motions to dismiss one count against each defendant.

The complaint against Jensen charged him in Count I with possessing marijuana with intent to sell within 1,000 feet of school property and in Count II with possessing marijuana without paying the tax imposed pursuant to K.S.A. 1995 Supp. 79-5202. The district court dismissed Count I. The district court left untouched the charge of possessing marijuana without paying the tax.

The complaint against Simpson charged him in Count I with possessing marijuana without paying the tax imposed pursuant to K.S.A. 1995 Supp. 79-5202 and in Count II with possessing marijuana with intent to sell. The district court dismissed Count II. The State already had dismissed Count I.

After the district court granted Jensen's and Simpson's motions to dismiss, this court issued its opinion in *State v. Gulledge*, 257 Kan. 915, 896 P.2d 378 (1995). In that case, based on *Kurth Ranch*, the district court dismissed a complaint against Barbara Gulledge charging her with possession of marijuana and possession of marijuana without a tax stamp. The State appealed. This court reversed the judgment and remanded for further proceedings. 257 Kan. at 931.

In *Gulledge*, the court gave the following brief overview of double jeopardy jurisprudence:

"In *State v. Cady*, 254 Kan. 393, 867 P.2d 270 (1994), we described the effect and application of the Double Jeopardy Clause as follows:

'The Double Jeopardy Clause of the United States Constitution protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) *multiple punishments for the same offense. Brown v. Ohio*, 432 U.S. 161, 165, 53 L. Ed. 2d 187, 97 S. Ct. 2221 (1977). The language of § 10 of the Kansas Constitution Bill of Rights is very similar to the language contained in the Fifth Amendment to the United States Constitution. Both provide in effect that no person shall be twice placed in jeopardy for the same offense. The language of the Fifth Amendment guarantees no greater protection to an accused than does § 10 of the Kansas Constitution Bill of Rights. Therefore, the underlying protection contained in the Double Jeopardy Clause of the United States Constitution is contained in § 10 of the Kansas Constitution Bill of Rights.' 254 Kan. at 396-97." (Emphasis added.) 257 Kan. at 920.

This court stated the issue in *Gulledge* as: "Does assessment and payment of amounts allegedly owed under the Kansas Drug Tax Act (Act) constitute a criminal punishment for double jeopardy purposes under the holding in [*Kurth Ranch*]?" 257 Kan. at 916-17. The court concluded that it did not. It reasoned that the Supreme Court relied upon two unusual features of the Montana drug tax scheme in finding a double jeopardy violation and that a statutory scheme, like the Kansas Act, without the unusual features would pass muster.

The issue in the present case, as in *Gulledge*, is whether defendants face multiple punishments for the same offense, but Jensen and Simpson argue that *Gulledge* was wrongly decided. We do not agree and conclude that *Gulledge* is controlling.

In addition to arguing that *Gulledge* was wrongly decided, Jensen and Simpson argue that there is an important aspect of Kansas' drug taxing scheme which was not examined in that case. That aspect is the 100 percent penalty which was assessed against each of them. The penalties for violation of the Act are set out in K.S.A. 1995 Supp. 79-5208:

"Any dealer violating this act is subject to a penalty of 100% of the tax in addition to the tax imposed by K.S.A. 79-5202 and amendments thereto. In addition to the

tax penalty imposed, a dealer distributing or possessing marijuana or controlled substances without affixing the appropriate stamps, labels or other indicia is guilty of a severity level 10 felony."

It is the contention of Jensen and Simpson that the 100 percent penalty is "a sanction clearly imposed to punish one who illegally possesses a controlled substance." As a sanction rather than a tax, the contention continues, it is subject to the test set out in *United States v. Halper*, 490 U.S. 435, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989), rather than to the *Kurth Ranch* tax analysis.

Irwin Halper managed a medical services laboratory. He was convicted on 65 counts of violating the criminal false claims statute for submitting false Medicare claims for reimbursement for services rendered. He was fined $5,000 and sentenced to prison. In a subsequent civil suit under the False Claims Act, the government was granted summary judgment on the issue of liability on the basis of the convictions. The statute authorized a sanction of $2,000 plus double damages for each violation. The United States Supreme Court concluded that the statutory penalty constituted a second punishment for the same conduct and that it was not rationally related to the goal of making the government whole. 490 U.S. at 451. The Court stated its holding as follows:

"We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." 490 U.S. at 448-49.

In *State v. Mertz*, 258 Kan. 745, 907 P.2d 847 (1995), we considered whether a prosecution for DUI, following a defendant's driver's license revocation, constituted multiple punishment and thus violated the Double Jeopardy Clause of the United States and Kansas Constitutions. We found it did not. As to *Kurth Ranch* and *Halper*, we said:

"The defendant's reliance on *Kurth Ranch* is misplaced for two reasons. First, contrary to the defendant's position, *Kurth Ranch* seems to interpret *Halper* as promulgating a restrictive, rather than expansive, definition of punishment. In analyzing *Halper*, the Court quoted the clause of *Halper* that states a civil sanction is punishment if the sanction ' "may not fairly be characterized as remedial, but

only as a deterrent or retribution."' 128 L. Ed. 2d at 777. Thus, *Kurth Ranch* follows the interpretation that if a sanction has a remedial purpose at all, then it is not punishment. Consistent with this interpretation, *Kurth Ranch* states later in the opinion that 'neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax a form of punishment.' 128 L. Ed. 2d at 779. The second reason the defendant's reliance on *Kurth Ranch* is invalid is that the court specifically found *Halper*'s definition of punishment did not apply to the tax statute at issue in *Kurth Ranch*. In *Kurth Ranch*, the tax was found to be punishment not because of the *Halper* punitive purpose rule but because of several unusual features of the tax statute. Thus, *Kurth Ranch* does not apply to the situation at hand." 258 Kan. at 754-55.

We then concluded:

"We hold the suspension sanction in this case serves a purpose which is solely remedial, in that the sanction's purpose is to protect the public. The suspension sanction quickly removes dangerous drivers from the street to prevent them from injuring anyone. Any harmful effect which the sanction may have on the driver simply indicates that the sanction may appear to be punitive from the driver's perspective. Such harmful effects do not necessarily indicate that the sanction carries purposes of punishment such as deterrence and retribution. While certainly the sanction *may* be interpreted as having punitive effects, this does not mean the sanction *must* be interpreted as having punitive effects. [*United States v.*] *Hudson*, 14 F.3d [536,] at 540 [(10th Cir. 1994)]. Thus, the sanction does not serve the purpose of punishment. Rather, it protects the public safety as a solely remedial sanction. Moreover, following *Halper*'s suggestion as to what factors might make a sanction remedial, the suspension of a driver's license seems proportionate to driving with a .08 or greater blood alcohol concentration." 258 Kan. at 760.

In *In the Matter of C.M.J.*, 259 Kan. 854, 915 P.2d 62 (1996), we considered whether the expulsion of a student from high school precluded adjudication of a student as a juvenile delinquent based upon the same conduct. The district court determined that it was a violation of the double jeopardy protections. The State appealed, and we reversed the trial court. C.M.J. relied on *Halper* in arguing that the juvenile prosecution subjected C.M.J. to multiple punishments. We disagreed, stating:

"Although we said in *Mertz*, 258 Kan. 745, Syl. ¶ 5, that '[a] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment,' nevertheless, a civil sanction will rarely qualify as punishment for double jeopardy purposes. We recognized this in *Mertz* when we said:

'The rules announced in *United States v. Halper*, 490 U.S. 435, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989), concerning the issue of whether a civil sanction constitutes punishment so as to prohibit a criminal prosection for the same offense are rules for the rare case.' 258 Kan. 745, Syl. ¶ 7.

. . . .

"Furthermore, a sanction is deemed to have a remedial purpose if it protects the public from harm. Even though it may appear to have punitive effects and might be interpreted as punishment, if it also can support a construction as remedial, it will not form the basis for a challenge on the grounds of double jeopardy. See *Mertz*, 258 Kan. 745, Syl. ¶¶ 8, 10.

"In short, a civil sanction may invoke double jeopardy protections as a form of 'punishment' only if it is grossly disproportional to legitimate State goals separate from those served by criminal prosecution. See *Kurth Ranch*, 128 L. Ed. 2d at 779, 781; *Halper*, 490 U.S. at 452. Neither the severity of the sanction nor the fact that it has a deterrent purpose automatically establishes that it is a form of punishment. See *Kurth Ranch*, 128 L. Ed. 2d at 779. Nor does the fact that the sanction has a punitive component invoke double jeopardy protection where the government's remedial interests are tightly intertwined with its punitive interests. See *U.S. v. Hernandez-Fundora*, 49 F.3d 848, 852 (2d Cir. 1995) (remedial interest of maintaining order in a prison setting permits sanctions with punitive component, without being punishment for double jeopardy purposes). '[T]he fact that remedial concerns require "punishing" individuals for violent or other disruptive conduct [in an institutional setting] does not mean that the sanctions imposed constitute "punishment" for double jeopardy purposes.' *Hernandez-Fundora*, 49 F.3d at 852." 259 Kan. at 859.

Jensen and Simpson note that this court determined that the primary purpose of the Kansas Act is deterrent. See 257 Kan. at 923. They contend that the primary purpose of the penalty cannot be said to be remedial if that of the tax is deterrent.

The State argues that the same analysis should apply to both tax and penalty because the 100 percent penalty does nothing more than "increase the amount of the tax burden." In *Kurth Ranch*, the Supreme Court stated that it would be inappropriate to subject Montana's drug tax to the *Halper* test. 128 L. Ed. 2d at 781. The Court reasoned:

"In *Halper*, we recognized that a civil penalty may be imposed as a remedy for actual costs to the State that are attributable to the defendant's conduct. 490 U.S. at 452, 104 L. Ed. 2d 487, 109 S. Ct. 1892. Yet as The Chief Justice points out, tax statutes serve a purpose quite different from civil penalties, and *Halper's* method of determining whether the exaction was remedial or punitive 'simply

does not work in the case of a tax statute. [Citation omitted.]' " 128 L. Ed. 2d at 781.

Thus, under the State's analysis, the *Kurth Ranch* test rather than the *Halper* test should be applied to the 100 percent penalty as well as to the tax.

For a slightly different reason, KDR agrees with the State that the *Kurth Ranch* test is appropriately applied to the penalty. KDR suggests that it would be illogical, where the tax has been determined not to violate the Double Jeopardy Clause, if the penalty for failing to pay the tax were not likewise determined to be unobjectionable. The suggestion has merit.

The State makes the additional argument that the 100 percent penalty is imposed for failure to pay the drug tax rather than for possessing the drug. We agree. The express language of 79-5208 supports the understanding that what is being penalized is the failure to pay the drug tax. The question for this double jeopardy challenge is whether there were multiple punishments for the same offense. Since the 100 percent penalty is exacted for failing to pay the drug tax rather than for possessing the drug, Jensen and Simpson were not punished more than once for failing to pay the drug tax. What makes this point significant is that the charge the district court *dismissed* against Jensen was possession of marijuana with intent to sell within 1,000 feet of a school and, against Simpson, was possession of marijuana with intent to sell. Thus, the charges which were dismissed as carrying duplicative punishments would not have punished the same offense as the 100 percent penalty. The 100 percent penalty is punishment for the offense of failing to pay the drug tax, and the punishment for the dismissed charges would have been for possessing the drug. Because the punishments are not for the same offense, the Double Jeopardy Clause is not implicated.

We conclude that our rationale in *Gulledge* is controlling as to the 100 percent penalty. The basis for our decision was that the features which rendered the Montana drug tax law unconstitutional did not exist in the Kansas drug tax statute. The same analysis applies to the penalty provision.

The district court erred in holding that prosecution on the possession of marijuana charges was precluded as a violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

Jensen's conviction of possession of marijuana without paying the drug tax is affirmed. The district court's dismissal of the possession of marijuana charges against Jensen and Simpson is reversed, and the cases are remanded with directions to reinstate the charges against both defendants.