SIXTH DIVISION
February 9, 2007

No. 1-04-2469

THE PEOPLE OF THE STATE OF ILLINOIS,          )          Appeal from the
                                              )          Circuit Court of
               Plaintiff-Appellee,            )          Cook County.
                                              )
v.                                            )          No. 03 CR 16293
                                              )
JORGE GOROSTEATA,                             )          Honorable
                                              )          James M. Obbish,
               Defendant-Appellant.           )          Judge Presiding.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant, Jorge Gorosteata, appeals after a jury trial from his convictions of possession of cannabis with intent to deliver and possession of a controlled substance with intent to deliver. On appeal, he contends that the circuit court erred when it denied his motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978); permitted the State to make improper closing argument; imposed inapplicable fines and fees in his sentence; ordered the extraction and storage of his DNA; and identified the wrong offenses of conviction in his mittimus. For the following reasons, we affirm in part, reverse in part, and correct the mittimus.

FACTUAL BACKGROUND

On June 25, 2003, Chicago police officer Richard Sanchez made a complaint to the circuit court for the issuance of a search warrant. In the complaint, Sanchez averred:

"I had the occasion to have a conversation with a concerned citizen

who will be known for the purpose of this search warrant as John Doe. During the course of this conversation John Doe stated the following facts to me.

John Doe stated that on the evening of 24-June-03 John Doe went to the location of 4849 So. Honore St. and knocked on the front door that leads to the second floor apartment at this location. At this time, the door was opened by a M/WH [male, white Hispanic] subject know to John Doe as Gordo. John Doe describes Gordo as a M/WH 35 yoa [years of age] 6'0" 250 lbs. short black hair medium complexion and a mustache. John Doe was admitted entry to this 2nd floor apartment by Gordo. Once inside of this apartment, John Doe states that John Doe observed Gordo remove (3) large green plant brick shaped objects wrapped in clear plastic wrap from a brown cardboard box and place these items on the kitchen table. John Doe states that Gordo then unwrapped one of these bricks of green plant substance and removed a large chunk. While inside of this location John Doe had the occasion to ingest (smoke) some of the green plant substance that Gordo removed from the unwrapped brick of green plant substance. John Doe states that after ingesting this substance John Doe experienced the same sensation as in the past when smoking marijuana (cannabis). John doe [*sic*] states that John Doe has smoked marijuana for over (5) years and could distinguish marijuana (cannabis) from a similar

substance. John Doe states that John Doe has purchased marijuana in the past from Gordo, and that Gordo sells multiple pounds of marijuana at a time. While inside of this location John Doe states that Gordo offered to sell John Doe marijuana for $600.00 a pound. John Doe estimates that when John Doe left this location ion 24-June-03, Gordo possessed inside of 4849 So. Honore 2nd floor apt. Chicago, Ill. Cook County at least 30 pounds of marijuana. John Doe also states that Gordo resides at this same location of 4849 So. Honore Chicago, Ill. 2nd floor apartment and that this is the only apartment located on the second floor at this location."

The parties do not dispute that John Doe accompanied Officer Sanchez when he presented the complaint to the circuit court and testified to the statements in the complaint before the court.

The circuit court approved a search warrant for the second-floor apartment at 4849 S. Honore, and a team of police executed the warrant on June 26, 2003. In a small, back bedroom in the apartment, police recovered two gray duffel bags containing clear plastic bags containing a crushed green plant. Later, in the course of the search, police also recovered bottles of inositol, an agent used to dilute cocaine, as well as three bags of "rock like" white powder. Testing revealed the crushed green plant to be marijuana, weighing 51,635 grams, and the white powder to be cocaine, weighing 90 grams. Defendant was charged with one count of possession of cannabis with intent to deliver and one count of possession of a controlled substance with intent to deliver.

Prior to trial, defendant challenged the search warrant, filing a "Motion for a '<u>Franks</u>'

Hearing in Order to Quash the Search Warrant and Suppress Evidence Illegally Seized." In that motion, defendant denied John Doe's account of the events alleged to have occurred on June 24 and asserted that Officer Sanchez relied on Doe's account in reckless disregard of the truth. In support of his motion, defendant attached a number of affidavits, including his own, plus that of Carmen Guzman, and those of Massiel and Dulce Gorosteata. In his own affidavit, defendant repeated his blanket denial of Doe's allegations, and asserted that he actually resided at 4612 S. Talman.

In her affidavit, Carmen Guzman swore that defendant, with whom she had a child, picked them up at 4612 S. Talman around 10 a.m. on the morning of June 24, 2003. The three of them proceeded to the second-floor apartment at 4849 S. Honore, arriving at approximately 10:15. At 10:30, Carmen and two other women, Massiel and Dulce, left to grocery shop for dinner, including ingredients for a cake. Carmen left defendant in charge of the children in the apartment. By 12:30, Carmen, Massiel, and Dulce returned to the apartment and found defendant playing with the children, as well as watching television, with his uncle, Fructuoso. From that point on, defendant remained in the apartment with his family; no other person came to the apartment to be shown, or to smoke, marijuana.

Dulce Goroteata swore that she was defendant's sister and that she was present in the second-floor apartment at 4849 S. Honore on June 24, 2003, along with other family members, from 12:30 p.m. onward, preparing dinner. She averred that defendant did not invite any person into the apartment to show or smoke marijuana.

Massiel Gorosteata averred in her affidavit that she was defendant's sister-in-law. As of

1-04-2469

June 24, 2003, she resided in the second-floor of 4849 S. Honore. Massiel confirmed that defendant, Carmen, and their daughter arrived at the second floor apartment around 10:15 on June 24. Massiel, likewise, corroborated that she, Carmen, and Dulce left the apartment around 10:30 and did not return until 12:30. Like the other affiants, she denied that defendant met with any person, while she was present at the apartment, to show marijuana.

Nearly three months later, defendant filed supplemental affidavits from the same affiants in support of his Franks motion. In his own supplemental affidavit, defendant averred that his family got together at 4849 S. Honore on June 24, 2003, to celebrate his daughter's birthday. He admitted that he "occasionally resided" at that address and that he "use[d] [the] residence quite often." He stored items in the garage, had keys to the apartment, and did "not need to ask for permission to enter or exit." He averred that he was constantly in the company of family during his time in the apartment on June 24. In her supplemental affidavit, Massiel stated that there was never any smell of marijuana in the apartment on June 24. The family's children did not tell of any strangers coming to visit during the women's grocery trip. Likewise, there were no visitors during the remainder of that day, during which time defendant remained in the apartment. Massiel corroborated defendant's averment that he occasionally resided at the apartment and had his own set of keys. Carmen's supplemental affidavit largely mirrored that of Massiel. However, she also averred that defendant slept with her on a couch in the apartment after their daughter's party, that she was a light sleeper, and that she would have noticed if anyone had knocked at the apartment door or if defendant had left her side.

The circuit court heard defendant's Franks motion on June 2, 2004. At the hearing, the

court stated that it failed to see how Officer Sanchez could have recklessly disregarded the truth of Doe's statements, since Sanchez brought Doe before the magistrate. In the circuit court's view, by doing so, the determination of the credibility of Doe became the burden of the magistrate and not of Sanchez. The State argued that defendant had failed to demonstrate his entitlement to a Franks hearing because all of his affidavits were from biased persons, whose accounts of the events of the day had shifted between their original and supplemental affidavits, and which did not positively rule out the occurrence of the transaction described by Doe. The circuit court ruled on the motion as follows:

> "As has been pointed out by the State there seems to [*sic*] inherent contradictions in the affidavits. The affidavits do not, even as presented[,] exclude the possibility of someone being able to go into that apartment of [defendant] on that date and observe what he alleges he observed.
>
>           \*\*\*
>
> In this case you have family members who in different parts of the affidavits allege different things, whether or not they lived there, whether or not they stayed there, they are contradictory on their face. I don't think the affidavits are sufficient to go to the next step for the Frank's hearing and your motion will be denied."

The cause then proceeded to trial.

The primary disputes at trial surrounded whether defendant controlled the room in which the narcotics were found so that his constructive possession of those drugs could be inferred.

The State introduced a medical bill recovered from the room by the police listing 4849 S. Honore as defendant's home address. The State further presented an officer's testimony that defendant admitted the drugs were his and that the rest of his family had no knowledge of their presence.

Defendant, Carmen, Maciel, and Lazaro Corona-Cruz, another family member living at the Honore apartment, all testified that, at all pertinent times, defendant lived with Carmen at 4612 S. Talman. Each conceded, however, that defendant worked next door to 4849 S. Honore as a self-employed mechanic and that he would occasionally sleep over in the apartment's living room. Moreover, on cross-examination, the State inquired of Carmen if defendant received any mail at the Talman address and she admitted that defendant received "one or tow [*sic*] letters but none," and testified that she did not have any of that mail. But, defendant and various members of his family further testified that the room where the drugs were discovered was never used by defendant but was, rather, the room of defendant's uncle, Fructuoso, who had since returned to Mexico. Defendant further averred that the medical bill the police discovered only contained the 4849 S. Honore address because he thought he might be moving from where he was actually living at the time and that he did not know how the receipt would have reached the room where it was found.

Defendant noted that, of the many officers present for the search, only one testified to his alleged admission of possession, which he explicitly denied making. He further challenged the officers' credibility by presenting testimony disputing the manner of their entry into the apartment and the subsequent search. For example, defendant presented testimony that he only possessed keys to the back door of the apartment, whereas the police claimed to have used his keys to enter

through the front door. Defendant likewise presented testimony that there was a dog in the apartment that the police threatened to shoot if not restrained, while the police testified either that there was no dog or that it was already outside when they conducted their search. Finally, defendant's witnesses described the police as entering the apartment with weapons drawn, whereas the police all testified that their guns were holstered at all times.

The State, in summation, argued that, since the officers testified that they never had come into contact with defendant before, the "officers didn't have a personal vendetta against [defendant]" and, therefore, that the officer testifying to defendant's admission of possessing the drugs should be believed. The State also attacked Carmen's testimony as to defendant's residence away from the South Honore apartment, observing:

> "[S]he told you that the defendant rarely received mail at the Talman address but that he did receive some mail there.
>
> Well, ladies and gentlemen, we haven't seen anything regarding that, any type of mail the defendant possibly received at the Talman address. And we haven't seen anything because nothing exist[s], ladies and gentlemen."

In the defense's closing argument, defense counsel repeated his attack on the credibility of the arresting officers. Defense counsel, again, emphasized the varying accounts surrounding the presence of a dog at the apartment, the officers' ability to open the front door of the apartment with keys from defendant, and whether the officers' guns were drawn. Defense counsel, likewise, again, suggested that the drugs recovered belonged to Fructuoso, not defendant.

In rebuttal, the State argued:

"Members of the jury, counsel did a fantastic job of summing up the evidence you heard yesterday. And in one day yesterday you heard two totally different stories, two stories that were almost diametrically opposed. And so what you're left with today in order to find your verdict is your ability to apply the facts and your common sense to the law and your ability to differentiate fact from fiction.

The State's witnesses told you that only the defendant walked out of the front door of that address, only the defendant. Defense's witness tells you 'No. Three people walked out of that door, Fructoso Villasenor and the defendant.'

Officers on the State's case tell you they walk upstairs only with the defendant. The defense tell[s] you, 'No. Three people walked back upstairs with those officers Villasenor, the defendant and Fructoso.'

Officers tell you there is no dog in the apartment. But everybody else on the defense side says 'No, there was a dog in the apartment. They made us take it outside.' Officers tell you no guns were drawn, and they weren't drawn because they conducted that surveillance waiting for their sergeant. They didn't need their guns drawn.

But the defendant's witnesses say, 'No. All of them had their guns drawn.' Ladies and gentlemen, counsel wants you to focus on those

differences in minor details because he want to try and create a reasonable doubt in your mind but it shouldn't. It shouldn't because those minor details, smoke and mirrors, ladies and gentlemen, look over here at these minor differences in details, so you don't think about the real issues in the case.

And the real issues *** was [*sic*] that [defendant] was in possession of cannabis and cocaine and that he had intent to deliver those controlled substances. And, ladies and gentlemen, those issues have been resolved. The real issues have been resolved.

They've [*sic*] been resolved by the credible testimony of officers with years of experience and the less and believable testimony of those defense's witnesses."

The State, further, reiterated its summation argument that the police had no motive to falsely testify, stating: "What interest did those police officers have on [pinning] it on this guy?"; and "Why would they pin it on him[?] He's [defendant] never been arrested before. He never met him before which mean[s] he had no beef with them before and they had [no] beef with him. So why pin it on him[?] This is just some huge conspiracy to pin a 50 thousand gram on him"; and "Why would officers attempt to pin 50 thousand grams of pot on this man–on a man they never met, never had a problem with?"

The State also launched its own attack on the credibility of the defense witnesses, arguing:

"But the story you heard from the defendant and the defense witnesses, that story never exi[s]ted until today. How do we know that? Because they had an opportunity during that interview with the Spanish speaking officer to tell them 'Hey, you know what. The drugs that you found in that back room, I don't know whose it is.' Uncle Fructuoso lives in that bedroom and that's an important piece of information. But when asked whose are these, they seen them coming from that back room. No one says a word. They had a whole year to think about between the sister-in-law– *** Carmen Guzman to think of a way out ***."

Defense counsel objected to the comment about "having a whole year to think about," but the objection was overruled by the circuit court. Shortly after these comments, and after deriding the defense theory that the drugs would actually have belonged to Fructuoso as "convenient," "[q]uite easy," and "[v]ery courageous," the State argued: "Ladies and gentlemen, I suggest to you this is not a television show. This isn't 'The Practice' where lawyers can get away with a Plan B defense."

The jury returned a verdict of guilty on both counts, one for possession of cannabis with intent to deliver, and the other for possession of a controlled substance with intent to deliver, addressing the cocaine. Defendant filed a posttrial motion challenging the sufficiency of the evidence and also questioning the circuit court's refusal to grant a mistrial when, in the context of attempting to impeach defendant with an affidavit in support of his pretrial Franks motion, the State revealed to the jury that defendant had been held in custody. The court found any error,

1-04-2469

from what it found to be an inadvertent disclosure of that information, not to be significant enough to warrant a new trial, however. The trial court went on to sentence defendant to eight years in prison and ordered the extraction of defendant's DNA for storage in the Illinois State Police's databank. Defendant appeals.

ANALYSIS

I. Franks

On appeal, defendant first argues that the circuit court erred by declining to grant him a hearing pursuant to Franks v. Delaware. Defendant contends that the circuit court inappropriately factored inconsistencies in the affidavits that were immaterial to the question of whether Doe could have taken part in the transaction and viewed what he alleged, and that the court "mistakenly believed that any affidavits originating with members of Mr. Gorosteata's family were *per se* insufficient to require a Franks hearing." The State first counters that defendant has waived review of this issue by failing to raise it in his posttrial motion. We agree with the State. Failing to raise the denial of a pretrial motion in a posttrial motion results in waiver. See People v. Owens, 99 Ill. App. 3d 730, 736 (1981).

Defendant asks us, nevertheless, to review the circuit court's decision for plain error. An otherwise waived contention may be reviewed for plain error "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." People v. Herron, 215 Ill. 2d 167, 187 (2005). However, to succeed under a plain error analysis, the appellant must still demonstrate error, which we find that defendant cannot do in this case. See People v. Johnson, 218 Ill. 2d 125, 139 (2005) ("Clearly,

-12-

there can be no plain error if there is no error").

In <u>Franks</u>, the Supreme Court held that defendants must be permitted to attack the veracity of the statements made by governmental affiants in applications for search warrants at an evidentiary hearing if they made a "substantial preliminary showing," including a counteroffer of proof, that the affiant deliberately included falsehoods or included allegations with a "reckless disregard for the truth." <u>Franks v. Delaware</u>, 438 U.S. 154, 170-71, 57 L. Ed. 2d 667, 681-82, 98 S. Ct. 2674, 2684 (1978). See also <u>People v. Lucente</u>, 116 Ill. 2d 133, 151-52 (1987) ("<u>Franks</u> demands something more than a request, and even more than a defendant's unsubstantiated denial. *** [T]he precise standard lies somewhere between mere denials on the one hand and proof by a preponderance on the other"). The purpose of permitting attacks on search warrant affidavits is to deter police misconduct. See <u>Franks</u>, 438 U.S. at 172, 57 L. Ed. 2d at 682, 98 S. Ct. at 2685 ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant"); <u>United States v. Owens</u>, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show that the informant lied to an unsuspecting affiant, or that an affiant's negligence or innocent mistake resulted in false statements in the affidavit").

Here, to begin with, defendant has not shown that the circuit court abused its discretion in determining that he failed to make the "substantial preliminary showing" necessary to warrant a hearing. See <u>People v. Castro</u>, 190 Ill. App. 3d 227, 237 (1989) (holding that the determination of whether a defendant made the necessary showing to warrant a <u>Franks</u> hearing is within the discretion of the circuit court).

In the case at bar, defendant provided two sets of affidavits in support of his contention that he never met and sold marijuana to Doe. These affidavits are suspect to begin with, since they all derive from family members. See People v. Tovar, 169 Ill. App. 3d 986, 992 (1988); People v. McCoy, 295 Ill. App. 3d 988, 990 (1998). More importantly, they do not preclude the possibility that defendant executed a narcotics transaction with Doe as he recounted to Officer Sanchez. Each affiant for defendant avers that he or she left defendant at the home for a time while he or she went out to obtain groceries. See Tovar, 169 Ill. App. 3d at 992 (affirming the denial of a Franks hearing where, *inter alia*, "the affidavits did not establish an impossibility of the informant having access to the apartment"); McCoy, 295 Ill. App. 3d at 999-1000 ("We find that the affidavits were not sufficient to establish that the trial court abused its discretion in denying defendant's motion for a Franks hearing. Not only were the affidavits executed by interested parties, but there were times when defendant was in his apartment *** during which time the informant could have purchased narcotics from him"). Finally, the affidavits do nothing to show how Sanchez necessarily, deliberately included false statements in his affidavit in support of the warrant or included averments with reckless disregard for the truth. Even had defendant's affidavits, taken as true, shown that he was constantly in the company of his family for his daughter's birthday on the date Doe alleged the narcotics transaction, so that the transaction could not have occurred, that would not have shown Doe's allegations to be so contradictory or outrageous that Sanchez would have engaged in misconduct merely by believing Doe.

More overridingly, there appears to be no dispute that John Doe personally testified

1-04-2469

before the magistrate at the time Officer Sanchez applied for the search warrant. We agree with the circuit court that the police's employment of this procedure, rather than the officer merely presenting and vouching for his informant's claims in the officer's complaint, without presenting the informant to the court for interrogation, removed this case from the ambit of Franks.

A number of courts have recognized, as did the circuit court, that, when a non-governmental informant is personally brought before the magistrate to testify to the facts that will establish probable cause in a warrant, the burden of determining the reliability of the informant then shifts to the court and away from law enforcement personnel.[1] As the Supreme Court of Kansas stated in State v. Jensen, 259 Kan. 781, 788, 915 P.2d 109, 115 (1996): "Although the Franks Court did not expressly limit [a veracity challenge] to an affidavit sworn to by a government agent, we agree with the State that it is intrinsic to the decision." Thus, even though the Jensen court found that its magistrate failed to adequately probe the reliability of its informant, it, nonetheless, held that its defendant was not entitled to a Franks hearing. The Jensen court explained:

> "In this case, [the informant's] reliability was an unknown quantity to
> police, who avoided the issue by making no representations about it and
> having [the informant] testify before the magistrate. The magistrate could
> and should have questioned [the informant] and the officers in order to
> satisfy the intertwined requirement of the informant's reliability. Here,

---

[1] None of the parties have alleged that John Doe was anything other than a private citizen as averred in Officer Sanchez's affidavit.

-15-

1-04-2469

however, the issuing judge ignored the opportunity to elicit information on

which an opinion of the informant's reliability could have been based.  The

few minutes in which [the informant] appeared to testify may have

permitted the judge to form an initial impression of the informant as

credible or not, but an impression based on appearance and demeanor

cannot replace an opinion formed on facts.  *That failure lies with the*

*issuing magistrate and not with the law enforcement officers.*  The district

court correctly interpreted *** Franks *** and did not err in denying a

hearing."  (Emphasis added).  Jensen, 259 Kan. at 790; 915 P.2d at 116.

See also State v. Moore, 54 Wash App. 211, 215, 773 P.2d 96, 98 (1989) ("If, however, a

nongovernmental affiant provides testimony upon which a warrant is based and that testimony is

later shown to have been intentionally false or gathered by means that would constitute a

constitutional violation if done by a governmental agent, Franks, nonetheless, does not apply.

[Citations.]  Franks does not apply in such instances because there exists no governmental

misconduct that could be detected or deterred by a Franks hearing").

In fact, this court also essentially so held in People v. Phillips, 265 Ill. App. 3d 438, 448

(1994).  In that case, in addition to a motion invoking Franks, the defendant filed a motion to

suppress the evidence gathered by exercise of that warrant asserting that probable cause had not

been established to support the warrant application because there was no showing of the

credibility of the informant.  In addressing the motion to suppress, the Phillips court stated:

"[C]ases which concern the credibility of hearsay informants have

-16-

no relevance to a case such as that presented here, where the informant

appears before the issuing judge. [Citation.] When the informant appears

before the judge issuing the search warrant, the informant is under oath

and any statement which he makes is subject to that oath; moreover, the

judge has the opportunity to personally observe the demeanor of the

informant and to assess the informant's credibility." Phillips, 265 Ill. App.

at 448.

The Phillips court went on to hold that, when the informant appears before the magistrate, it is

not even necessary for the police to corroborate the informant's account since "the judge issuing

the search warrant ha[s] an opportunity to *** determine the basis of [the informant's]

knowledge." Phillips, 265 Ill. App. at 448.

Thus, since John Doe appeared before the magistrate to testify surrounding the allegations

contained in the complaint for the search warrant of the second-floor apartment at 4849 S.

Honore, this case falls outside the scope of Franks. Therefore, there was no error on the part of

the circuit court in denying defendant a Franks evidentiary hearing.

## II. Closing Arguments

Defendant next contends that the circuit court erred by permitting improper and

prejudicial closing arguments. Defendant argues that the State engaged in impermissible

bolstering of its witnesses by suggesting that they were inherently credible because they were

police officers. Defendant further contends that the prosecution improperly shifted the burden of

proof to him when it emphasized that Carmen admitted on cross-examination that she had no

mail addressed to defendant at 4612 S. Talman, to support her claim that he lived there and not at 4849 S. Honore. Finally, defendant argues that the State impermissibly denigrated his defense by describing it as "smoke and mirrors" and suggesting that he, his witnesses, and his attorneys concocted a defense.

As the State points out, as with his Franks claim, defendant has waived review of the closing arguments by failing to make contemporaneous objections and by failing to raise them as errors in his posttrial motion. But, defendant, again, contends that he is entitled to analysis and relief under the plain error doctrine. As previously discussed,

> "[T]he plain-error doctrine bypasses normal forfeiture principles and
> allows a reviewing court to consider unpreserved error when either (1) the
> evidence is close, regardless of the seriousness of the error, or (2) the error
> is serious, regardless of the closeness of the evidence. In the first instance,
> the defendant must prove 'prejudicial error.' *** In the second instance,
> the defendant must prove there was plain error and that the error was so
> serious that it affected the fairness of the defendant's trial and challenged
> the integrity of the judicial process." People v. Herron, 215 Ill. 2d 167,
> 186-87 (2005).

See also People v. Nitz, 219 Ill. 2d 400, 415 (2006) ("Herron's two prongs establish two categories of plain error: prejudicial errors, which may have affected the outcome in a closely balanced case, and presumptively prejudicial errors, which must be remedied although they may not have affected the outcome"); People v. Edgecombe, 317 Ill. App. 3d 615, 620 (2000)

("Improper remarks are reversible error only when they result in substantial prejudice to the defendant, given the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial"). Defendant contends that the prosecution's improper arguments tipped the balance in what he characterizes as a closely balanced case since it required the assessment of witnesses' credibility. Defendant, however, also contends that the cumulative effect of the erroneous arguments undermined the fairness of his trial. We, however, disagree since we do not find the evidence to be close; and, otherwise, find that the fairness of defendant's trial and integrity of the proceedings were not undermined.

We first address defendant's contention that the State's argument improperly shifted the burden of proof to him. See People v. Weinstein, 35 Ill. 2d 467, 470 (1966) ("the prosecution has the burden of proving beyond a reasonable doubt all the material and essential facts constituting the crime. [Citations.] The burden of such proof never shifts to the accused, but remains the responsibility of the prosecution throughout the trial"); People v. Carroll, 278 Ill. App. 3d 464, 467 (1996) ("It is improper *** to suggest to the jury that the State had no burden of proof or to attempt to shift the burden to the defendant"). Defendant takes particular exception to the prosecutor's comment "Well, ladies and gentlemen, we haven't seen anything regarding *** any type of mail defendant possibly received at the Talman address. And we haven't seen anything because nothing exist[s] ***." The State responds that this situation is akin to where a prosecutor comments on the absence of alibi witness testimony after a defendant identifies such potential witnesses, comments that courts have found to be proper in cases such as People v. Blakes, 63 Ill. 2d 354 (1976), and People v. Anderson, 250 Ill. App. 3d 439 (1993). Defendant

replies that the holdings of these cases are inapplicable, however, because, first, he never raised an alibi defense, and, second, because he never raised the issue of mail as a form of proof of address in his direct examination of Carmen. He asserts that the lack of mail addressed to him at his claimed address of 4612 S. Talman only came into evidence through the State's improper cross-examination of Carmen. We agree with the State.

To begin, People v. Williams, 40 Ill. 2d 522, 524-26 (1968), establishes that State comment on the absence of exculpatory evidence available to a defendant is not limited to the particular context of unproduced alibi witnesses. In Williams our supreme court addressed a prosecutor's statements, after the State produced evidence that bullets recovered from two murder victims were of the same class as a gun known to have belonged to the defendant, that the bullets could only be matched to defendant's gun if that gun were to be tested, and the defendant elicited that many of defendant's friends also carried guns of the same class. The prosecutor remarked in his opening statement: " 'The evidence in this case will show further that the gun purchased on March 1st [the defendant's gun] has never been found and has never been produced or brought forward by this defendant.' " Williams, 40 Ill. 2d at 526. In closing argument, the prosecutor stated: " 'I don't believe for a second that this man's gun will ever turn up. It can't. He can't afford to have that gun ever turn up. And we all know why he can't do that. We know why it hasn't turned up. We know why [the ballistics expert] has not been allowed to look at it to compare slugs fired from it with slugs in these plastic bags before you.' " Williams, 40 Ill. 2d at 527. The defendant asserted that the prosecutor's comments undercut the presumption of innocence and his right against self-incrimination. Williams, 40 Ill. 2d at 527. Reviewing the

prosecutor's statements, the <u>Williams</u> court observed: "A careful analysis of the privilege and the reason for the prohibition reveals that their purpose is to prevent prejudice to an accused from his failure to testify, *but not to prevent prejudice to his case from his failure to produce evidence to establish his defense*." (Emphasis added.) <u>Williams</u>, 40 Ill. 2d at 527. The <u>Williams</u> court went on to hold:

> "[T]hough the failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution. In the case before us there may have been some reason for failing to produce the gun in question, the gun which defendant had acquired the day before the murders and which by other evidence was so closely linked to the crime, but none was given and consequently defendant's nonproduction was a subject for consideration and also for comment." <u>Williams</u>, 40 Ill. 2d at 529.

The facts in this case are analogous to those presented in <u>Williams</u>. The State presented evidence, in the form of a medical bill addressed to defendant as 4849 S. Honore, to demonstrate that that was his true residence for purposes of establishing constructive possession of the narcotics found therein. Defendant and his witnesses testified that he did not live there but,

instead, at 4612 S. Talman. Carmen testified on cross-examination that defendant did receive some mail at the Talman address.[2] We think it would naturally and properly have been in the jury's mind why neither defendant nor Carmen would produce mail addressed to him at 4612 S. Talman, where they both claimed he resided.

Most significantly, the State's argument and examination did not suggest that defendant was under a general duty to produce evidence; rather, the examination and argument only reflected on the quality and credibility of the evidence that defendant's witness presented. In this respect, this case differs from People v. Clark, 186 Ill. App. 3d 109 (1989), People v. Lopez, 152 Ill. App. 3d 667 (1987), and People v. Giangrande, 101 Ill. App. 3d 397 (1981), on which defendant relies. In Giagrande, the prosecutor inquired " 'Now where's the evidence that the defendant didn't do it?' " (Emphasis omitted.) Giagrande, 101 Ill. app. 3d at 402. In Lopez, the prosecutor asked " 'Where are those people that can clear the defendant?' " Lopez, 152 Ill. App. 3d at 678. The prosecutor in Clark inquired why the defendant had not produced taxi and train receipts to support his witness's account that he traveled to Chicago from Palatine wearing a coat in the pocket of which, unbeknownst to the defendant, the witness had placed a gun. Clark, 186 Ill. App. 3d at 115. In each case, the reviewing court recognized that its prosecutor's statement, rather than commenting on any evidence presented, instead suggested that the defendant had a

---

[2] Defendant argues that Carmen's testimony that he received "[o]ne or two letters but none" means that he received no mail addressed to him. However, we see this reading to be speculative. In fact, none of her testimony preceding or following that statement suggests such a restrictive reading.

duty to produce evidence in support of his innocence. See Giangrande, 101 Ill. app. 3d at 402 ("we recognize that a prosecutor may comment on the uncontradicted nature of the State's case ***. *** [The comment] is more than a comment that evidence is uncontradicted. The comment may well have improperly suggested to the jury that defendant had a burden to introduce evidence"); Lopez, 152 Ill. App. 3d at 679 ("here there was no foundation for the State's remarks; defendant did not *name* any specific people in his opening argument, and the names read off by the State appeared in various pretrial discovery documents not in evidence. The first mention of these people occurred when the State introduced them in closing rebuttal argument" (emphasis in original)); Clark, 186 Ill. App. 3d at 115 ("We reject the State's assertion that the prosecutor was properly commenting on the evidence and defense witness Horn's credibility. The prosecutor's preliminary comment, " '[L]et me say by my commenting on anything [the witness] has said *or anything that the defense has suggested* (emphasis added),' clearly emphasized the defense's failure to produce certain evidence"). Since here, the State merely sought to undercut the testimony of Carmen, a defense *witness*, it did not suggest that defendant was required to abandon his right to silence generally or that he was under a duty to present evidence in support of his innocence. Thus, we perceive no burden shifting in this argument by the State.

Finally, defendant contends that Carmen's testimony, surrounding his receipt of mail at the Talman address and her nonproduction of such mail, could not have opened the door to later comment by the State on the grounds that the predicate testimony was elicited on cross-examination, and that it was improper cross-examination no less. We reject that contention. Our research reveals the law to be contrary to defendant's position. See People v. Outlaw, 75 Ill. App.

3d 626, 645 (1979) ("The State maintains that it is proper for a prosecutor, on cross-examination, to inquire into the circumstances of an alibi [citation], and to inquire of witnesses as to whether they had told the same story previously in order to determine whether the testimony was recently fabricated [citation]. We agree. We fail to see how such questioning shifted the burden upon defendant to prove his innocence since it was not his silence which was being tested but rather an examination of alibi witnesses which was being pursued"); People v. Woods, 292 Ill. App. 3d 172, 176-77 (1997) (holding that it is proper for the prosecution to comment on the failure of a defendant to produce alibi witnesses when those witnesses are identified in the defense's opening statement, or by defense witnesses, whether on direct or cross-examination). Furthermore, we note that defendant cited to no contrary authority and that he made no objection to the introduction of the evidence at trial.

We next analyze defendant's contention that the State improperly bolstered its witnesses. It "is well established that a prosecutor may not argue that a witness is more credible because of his status as a police officer." People v. Fields, 258 Ill. App. 3d 912, 921 (1994). This court has recognized various permutations of arguments extolling an officer's experience, or asserting that an officer would not lie merely to convict a particular defendant, as falling afoul of the aforementioned rule. See Fields, 258 Ill. App. 3d at 920-21 (where a prosecutor argued, " 'The police? Are they going to come in here and risk perjury, a perjury charge for Ronnie Fields? They're not going to do that for him. *** Would they risk their jobs, their careers, their pensions? Would they risk their reputation as police officers to lie for Ronnie Fields? Of course not' "); People v. Clark, 186 Ill. App. 3d 109, 115-16 (1989) (similarly asserting that the officers

testifying in that case would not risk their careers, pensions, and potential perjury charges by testifying falsely); People v. Rogers, 172 Ill. App. 3d 471, 476-77 (1988) (where a prosecutor observed that the detectives were " 'seasoned veterans on the police force. Credibility untouchable' " and further argued " 'they won't get on the stand and lie and make up something' "); People v. Ford, 113 Ill. App. 3d 659, 661-62 (1983) (where a prosecutor repeatedly referred to the testifying officer as a " 'sworn' " officer, also mentioned her " 'eight years of integrity serving in this community,' " and inquired " 'Why would Deputy Kurlinkus, a sworn Warren County Deputy, pull a charade like this and lie and perjure herself for a lousy 15 gram purchase of marijuana?' ").

In its closing argument in this case, the State argued that the "real issues have been resolved. They've [sic] been resolved by the credible testimony of officers with years of experience and the less believable testimony of those defense's witnesses [sic.]," and twice inquired what motivation the police would have had to falsely "pin" criminal charges on defendant, with whom they had no prior contact or "beef." Although not as egregious an example as in the previously cited cases, the prosecutor's statements here questioning why the officers would "pin" an offense on defendant and extolling their "years of experience" nevertheless suggests that they were incapable, as a result of their chosen profession, from lying and probably should have been avoided.

We turn, then, to defendant's claim that the State improperly denigrated his witnesses as well as his trial counsel. Specifically, defendant objects to two statements by the State. In the first, after addressing the disparity in the testimony of the police officers and defendant's

witnesses as to how many people were in front of the apartment at the time the police moved in, whether or not a dog was present, and whether or not the police had their guns drawn, the prosecutor argued:

> "Ladies and gentlemen, counsel wants you to focus on those differences in minor details because he wants to try and create a reasonable doubt in your mind but it shouldn't. It shouldn't because those minor details, smoke and mirrors, ladies and gentlemen, look over here at these minor differences in details, so you don't think about the real issues in this case."

We note that prosecutorial references to a defense as "smoke and mirrors," a "smokescreen," or other statements to that effect, have usually been held to be improper (see, e.g., People v. Kidd, 147 Ill. 2d 510, 542 (1992) ("It is abundantly clear that the prosecutor's comments comparing or analogizing the defense counsel's argument to a 'smoke screen' were improper. This court and our appellate court have on numerous occasions condemned such comments. [Citation.]")). Although the comments surrounding smoke and mirrors can be construed, as suggested by the State, as reflecting only on the trivial and collateral nature of the impeachment offered by the defense witnesses, it could also be viewed as an improper statement on the integrity of defense counsel (see People v. Rodriguez, 312 Ill. App. 3d 920, 931 (2000)), and should thus, again, have been excluded from the prosecution's argument. See also People v. Emerson, 97 Ill. 2d 487, 497 (1983) ("Unless based on some evidence, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper").

Later, in her rebuttal, the prosecutor attacked the credibility of the defense, stating: "But the story you heard from the defendant and the defense witnesses, that story never exi[s]ted until today. *** They had a whole year to think about *** to think of a way out." We note that the prosecutor then went on to observe "this is not a television show. This isn't 'The Practice' where lawyers can get away with a Plan B defense." These comments, too, while not directly charging the defense with suborning perjury or fabricating a defense, nevertheless, echo such charges and skirt the edge of propriety. See People v. Weathers, 62 Ill. 2d 114, 120 (1975) (including in its list of prosecutorial errors that "the Assistant State's Attorney charged the defendant's attorneys with lying and with attempting to create a reasonable doubt by 'confusion indecision, and misrepresentation' " and "charged repeatedly that the defendant lied"); People v. Slabaugh, 323 Ill. App. 3d 723, 730 (2001) ("We are not persuaded that the remarks were proper merely because in rebuttal the prosecutor specifically exempted defense counsel from complicity, contending instead that he was 'in a cloud of dust' while the defense witnesses independently 'concocted' the defense. In People v. Harris, 228 Ill. App. 3d 204, 208 (1992), this court condemned an argument that defendant herself suborned perjury by forcing her daughter to testify falsely. Here, the tenor of the argument was clearly that the defense was fabricated, regardless of who was at fault").

The State would contend, however, that even if any of its comments were facially improper, such impropriety would have been cured by the fact that it only made responses called for by invitations made in the defense's summation. But, we would reject this contention since the State has not shown any initial impropriety in defense counsel's argument from which the

invitation could emanate.

The invited response doctrine allows a party who is provoked by his opponent's improper argument to right the scale by fighting fire with fire. See, e.g., United States v. Young, 470 U.S. 1, 12-13, 84 L. Ed. 2d 1, 11, 105 S. Ct. 1038, 1045 (1985) ("if the prosecutor's remarks were 'invited' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction"); 75A Am. Jur. 2d Trial § 564 (1991) ("if counsel for a party litigant or for the defendant in a criminal prosecution pursues an improper line of argument, he thereby invites a reply, and statements made by opposing counsel or the prosecuting attorney by way of retaliation thereto have often been considered proper which would otherwise be objectionable"). See also B. Gershman, Trial Error and Misconduct § 5-1(c)(1), at 305 (1997) ("Thus, when one party succeeds in introducing evidence that is inadmissible, misleading, or otherwise improper, the other side may be allowed to 'fight fire with fire' by making an appropriate evidentiary response. *** Reference by one party to matters that the other party would be barred from mentioning may invite an appropriate response"). Courts have held that when the original party opens the door, through making his own improper argument, he is precluded from objecting to the response he invited either through waiver or estoppel. See People v. Enoch, 189 Ill. App. 3d 535, 548 (1989) ("A defendant should not be allowed to benefit from his own counsel's misconduct which invited the State's response); B. Gershman, Trial Error and Misconduct, § 6-2(g), at 398 (1997) ("If an appellate court concludes that an error was invited by counsel, it usually will not review the issue on the ground that counsel waived the claim"); 88 C.J.S. Trial § 297, at 335 (2001) ("Generally, the party whose counsel pursues an

improper argument and invites a reply is estopped to complain of the reply argument").

It must be emphasized that the invitation or provocation must be in the form of an *improper* argument from the other side. See Enoch, 189 Ill. App. 3d at 548; People v. Starks, 169 Ill. App. 3d 588, 600 (1988) (citing to United States v. Young, 470 U.S. at 12-13, 84 L. Ed. 2d at 10-11, 105 S. Ct. at 1045, for the proposition that the " 'invited response' rule [is] limited to instances of impropriety in [the] initial argument"). Where "the improper argument is not, in fact, a retaliatory argument, but instead, is the first improper argument made, reversal is warranted." 88 C.J.S. Trial § 297, at 335 (2001). See also Gallagher v. People, 211 Ill. 158, 169 (1904) (holding that a conviction may be reversed when an "unprovoked" improper argument is made); People v. Harbold, 124 Ill. App. 3d 363, 372 (1984) (rejecting the State's invited response claim when it found its defendant's argument to have been proper). Further, the response must be proportionate to the initial error. See, e.g., People v. Montgomery, 254 Ill. App. 3d 782, 795 (1993) ("The invited error doctrine does not go so far 'as to insulate any related remarks the prosecutor may choose to make' in response to defense arguments [citation]"); B. Gershman, Trial Error and Misconduct, § 5-1(c)(1), at 306 (1997) ([regarding curative admissibility] "when the defense presents a prosecutor with such an opening, a prosecutor may attempt to exploit the opportunity by introducing inadmissible evidence, or engaging in gratuitous overkill. The judge on such occasions must be alert to the potential for misconduct").

In particular, with respect to its comments on the experience of the police officers, the State appears to contend that the defense's questioning of the officers' credibility necessarily would have even opened the door for general arguments in support of police officers' credibility

as a class of people. The State draws our attention to defendant's closing argument in which he derided two officer's claims of entering the second-floor apartment without guns drawn, in contrast to defendant's witnesses' testimony, as being illogical since the officers would not have known what to expect on entering. The State further highlights defense counsel's statement, "[Y]ou saw every single officer testify *** you decide who is telling the truth." We fail to see how this defense argument was improper, however. "The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it." People v. Hudson, 157 Ill. 2d 401, 445 (1993). Here, the arguments that the State contends opened the door were based on the trial evidence. Thus, in our view, the door would have remained closed to any otherwise improper bolstering arguments by the State.

The cases of People v. Williams, 289 Ill. App. 3d 24 (1997), and People v. Davis, 228 Ill. App. 3d 835 (1992), on which the State relies, do not mandate a contrary finding. Contrary to the State's understanding of the case, Davis never held that a defendant's challenge to the credibility of police officers necessarily opened the door to otherwise improper bolstering in the State's argument. Rather, instead of fully considering the application of the invited response doctrine, Davis resolved its defendant's challenge to the State's argument on the ground that the defendant was not prejudiced since the State's comments did not deprive him of a fair trial, an issue that we will yet address in this case. See Davis, 228 Ill. App. 3d at 841 ("We acknowledge that courts have generally held that these types of comments concerning police officers' testimony are improper. [Citation.] Here, however, [citation] we believe that the question is not whether the argument was proper, but whether it reached the level of impropriety which deprived defendant

of a fair trial"). <u>Williams</u>, on the other hand, while purporting to rely on <u>Davis</u>, failed to recognize this distinction in reaching its conclusion that "defendant invited the prosecution's comments [about the police risking their lives everyday to protect the public and, therefore, deserving the public's gratitude] by making police credibility the central issue in the case." <u>Williams</u>, 289 Ill. App. 3d at 36. The <u>Williams</u> dissent, however, observed that the challenge to the officers' credibility in that case was properly done and therefore could not invite an improper argument from the State, stating:

> "Although defense counsel questioned the credibility of the police officers, counsel did so through use of the evidence presented at trial. While the prosecutor, in turn, was entitled to discuss why the police officers were more credible than defendant, he should have done so by discussing the evidence at trial, not by arguing that the officers should be believed because they put their lives in danger to protect people." <u>Williams</u>, 289 Ill. App. 3d at 39 (McNulty, J., dissenting).

Thus, we do not see <u>Davis</u> and <u>Williams</u> as supporting the State's interpretation of the invited error doctrine in this context.

The State further argues that its comments surrounding the defense witnesses having a year to "find a way out" could only have been proper because those comments merely argued the evidence and logical inferences to be drawn therefrom. The State contends that, since there was no testimony that any of the witnesses disclaimed that the drugs discovered belonged to defendant or informed the police that the room in which they were found actually belonged to

defendant's uncle, that the later recitation of those facts by the witnesses was incredible. However, there is a significant difference between properly highlighting a prior inconsistent statement by omission, inferred through silence when it would have been natural to speak, and accusing witnesses of actively conspiring to commit perjury, as the State did in this case. Although there might have been some circumstantial support for the conclusion, it would not have justified an impassioned argument that the defense witnesses were, in fact, committing perjury. 70 C.J.S. Perjury § 12, at 318 (2005) ("Mere contradictions or inconsistencies in a witness' testimony are not, of themselves, generally enough to support a charge of perjury"); Commonwealth v. Gilman, 470 Pa. 179, 188, 368 A.2d 253, 257 (1977) ("the prosecutor is a quasi-judicial officer representing the Commonwealth. His duty is to seek justice, not just convictions. [Citations.] *** During closing argument, the prosecutor has an obligation to '. . . present the facts so that the jury can dispassionately and objectively evaluate the testimony in a sober and reflective frame of mind that will produce judgment warranted by the evidence and not inspired by emotion or passion.' [Citation.] The prosecutor's position as both an administrator of justice and an advocate 'gives him a responsibility not to be vindictive or attempt in any manner to influence the jury by arousing their prejudices.' [Citations.] In particular, the prosecutor must limit his argument to the facts in evidence and legitimate inferences therefrom").

However, notwithstanding the State's overreaching errors in its arguments, we are still left to determine whether those arguments would have amounted to "plain error." See People v. Keene, 169 Ill. 2d 1, 17 (1996) ("while all plain errors are reversible ones, not all reversible errors are also 'plain' ***. [Citation.] *** to determine whether a purported error is 'plain'

1-04-2469

requires a substantive look at it").  In our view, defendant cannot demonstrate that the errors here were "plain."

As previously noted, we do not perceive the evidence in this case to be closely balanced. See Herron, 215 Ill. 2d at 187 ("In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant"); see also People v. Green, 74 Ill. 2d 444, 454 (1979) (Ryan, J., concurring) ("the court will look at the record only to see if the evidence is 'closely balanced.'  If it is not, the reason for considering the error in the absence of its preservation is not present"); Green, 74 Ill. 2d at 454 (Ryan, J., concurring) ("the strength or weakness of the evidence against [a defendant] is relevant [in determining the applicability of the plain error doctrine]"); People v. Alexander, 212 Ill. App. 3d 1091, 1101-02 (1991) ("When 'examin[ing] the strength or weakness of the evidence against [the defendant, in order to determine whether] *** the evidence is close [and whether] there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved' [citation], courts have tended to review claims as plain error when the conviction relied upon the conflicting testimony of eyewitnesses [citation], physical evidence was ambiguous [citation], the testimony of witnesses measured short of credibility [citation], or improprieties raised judicial suspicion as to the accuracy of the verdict [citation].  It has not been applied, however, even when physical evidence was inconclusive, if there were several witnesses

-33-

connecting the defendant to the crime").

In this case, the physical and testimonial evidence strongly weighed against defendant. According to police, they opened the door of the apartment building using defendant's keys. Mail of an important nature, a medical bill, was addressed to defendant at the address where the drugs were found. Further, that mail was found in the very room where the narcotics were recovered. Even more overridingly, at the time of his arrest, defendant admitted that the drugs were his and stated that his family was unconnected to them. None of the officers testifying against defendant were effectively impeached; while defendant attempted to contradict aspects of the officers' testimony through his own witnesses, the contradictions largely focused on secondary matters, such as the presence and exact location of a dog, or whether the officers had their guns drawn upon their entry into the apartment. On the other hand, all of the evidence in defendant's favor came only from himself or his family, who are persons with an inherent bias. See People v. Phillips, 265 Ill. App. 3d 438, 445 (1994) ("An affidavit of an interested party tends to be weaker support for a motion to quash the warrant"); 2 J. Wigmore, Evidence, § 949, at 332-33 (2d ed. 1923) ("The range of external circumstances *** from which probabl[e] bias may be inferred is infinite. *** Among the commoner sorts of circumstances are all those involving some *intimate family relationship* to one of the parties by blood or marriage") (emphasis in the original). Considering this balance of the evidence, we cannot find that the erroneous arguments "alone severely threatened to tip the scales of justice against him." See Herron, 215 Ill. 2d at 187.

Moreover, the bulk of the prosecution's argument analyzed and persuasively addressed

the evidence. The comments we have addressed above were minor and transitory. See People v. Hall, 195 Ill. 2d 1, 26 (2000) ("Considered in the context of the State's entire closing argument, these brief references did not deny defendant a fair sentencing hearing, or threaten deterioration of the judicial process. Consequently, we find no plain error"); People v. Terrell, 185 Ill. 2d 467, 514 (1998) ("the prosecutor's brief comments about the victim were not so inflammatory as to deny defendant a fair sentencing hearing"); People v. McCann, 348 Ill. App. 3d 328, 338-39 (2004) (holding that a prosecutor's reference to defense counsel as "an octopus releasing inky fluid" and as "throwing dust on the road to justice" did not deny the defendant a fair trial and amount to plain error where "the complained-of comments, when viewed in the context and totality of the closing arguments, were brief and isolated"). Unlike in cases where courts have reversed, the State did not make the improper matter and references a central or recurring theme in its argument. See Kidd, 147 Ill. 2d at 543-44 ("the assistant State's Attorney did not make just one fleeting, inadvertent remark ***. Rather, he commented *eight times* that defense counsel was 'raising a smoke screen,' or 'filling this courtroom with smoke today,' or 'hoping that the smoke he raises in this room today will strangle the truth like it strangled the life of the ten children,' etc. Thus, this case is unlike other cases in which the prosecutor made only a passing reference to a 'smoke screen' theme, and it was held not to be reversible error" (emphasis in original)). Further, since the State's arguments were focused upon credibility they did not distract the jurors from confronting the appropriate question of credibility in this case. See Davis, 228 Ill. App. 3d at 841 ("defendant argues that the comments [that the police would not risk their careers and pensions to frame the defendant] unfairly played upon the jury's sympathies. We disagree. The record shows

that it was precisely defendant's strategy to make the credibility of the officers the dispositive issue; defendant expressly attacked the credibility of the officers throughout the trial. Therefore, the prosecution's comments, in response to defendant's trial strategy, focused the jury's attention on the dispositive issue; the comments did not unfairly play upon the jury's sympathies and did not deny defendant a fair trial"). Thus, we cannot find that any of the above-described errors, individually or in combination could have denied defendant a fair trial or undermined the integrity of the judicial process. Hence, we must affirm defendant's conviction.

### III. Fines and Fees

We will next address defendant's challenge to the imposition of various fines and fees in his sentence.

Defendant first contends that the circuit court could not impose assessments without considering his ability to pay. We disagree. In People v. Fort, 362 Ill. App. 3d 1 (2005), the court observed that, although "the [controlled substance] assessment is a kind of fine, we see no need to remand for an inquiry into defendant's ability to pay it. The assessment is mandatory." Fort, 362 Ill. App. 3d at 8. The assessments levied against defendant are also mandatory. Therefore, the circuit court did not err by not considering defendant's ability to pay.

Defendant further argues that under section 110-14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14 (West 2004)), which provides defendants with a $5-per-day credit toward fines for each day of pretrial incarceration, he is entitled to a credit of $2,660 against his $6,000 controlled substance assessment under section 411.2 of the Illinois Controlled Substances Act (720 ILCS 570/411.2 (West 2004)). The State counters that the credit under the Code of

Criminal Procedure is inapplicable, however, because it only applies to "fines" while the other charge here is described in the statute creating it as an "assessment."

Our supreme court recently resolved this issue in favor of defendant in People v. Jones, No. 101996 (December 21, 2006). In reaching its result, Jones specifically approved of the reasoning of Fort. Jones, No. 101996, slip op. at 15-17. The Fort court observed that senators debating the assessments provision of the Illinois Controlled Substances Act referred to them as "fines." Fort, 362 Ill. App. 3d at 7. The Fort court further took as evidence that the legislature intended for the credit to be applicable from the fact that, in spite of the numerous appellate court decisions to that effect (see People v. Haycraft, 349 Ill. App. 3d 416 (2004); People v. Littlejohn, 338 Ill. App. 3d 281 (2003); People v. Rodriguez, 276 Ill. App. 3d 33 (1995); People v. Otero, 263 Ill. App. 3d 282 (1994); People v. Gathing, 334 Ill. App. 3d 617 (2002); People v. Reed, 255 Ill. App. 3d 949 (1994); People v. Brown, 242 Ill. App. 3d 465 (1993)), the legislature had declined to legislatively overrule those holdings, even though it had otherwise amended the statute three times following such decisions. Fort, 362 Ill. App. 3d at 8. Hence, defendant's drug assessment should have been reduced by his pretrial incarceration credits.

We next address defendant's contention that requiring him to contribute to the Spinal Cord Injury Paralysis Cure Research Trust Fund, pursuant to section 5-9-1.1(c) of the Unified Code of Corrections (730 ILCS 5/5-9-1.1(c) (West 2004)) would violate his due process rights because there is no rational relationship between the offense of possession of controlled substance with intent to deliver and the public interest that induced the legislature to create the spinal cord fund. On this issue, our supreme court's decision in Jones diverges from the holding

in Fort. Fort, relying on the on point holding of another recent case, People v. Rodriguez, 362 Ill. App. 3d 44 (2005), concurred with its defendant's position that no rational relationship existed between controlled substance offenses not involving motor vehicles and spinal cord research and that, therefore, imposition of the fee violated a defendant's substantive due process rights. See Fort, 362 Ill. App. 3d at 8. However, the Jones court disagreed with Fort. After initially determining that the $5 imposed for the Spinal Cord Injury Research Fund by statute, in spite of its label as a "fee," was, in fact, substantively, a "criminal penalty" or "fine" (Jones, No. 101996, slip op. at 24-25), the Jones court held:

> "A defendant has no basis for protesting the usage to which his criminal fines are put. The sole inquiry is whether the amount of the fine is excessive when compared to the criminal conduct in which the defendant is found to have engaged. So far as the propriety of inflicting a pecuniary punishment on a defendant is concerned, it makes no difference whether the fines are designated for deposit in the Spinal Cord Injury Paralysis Cure Research Trust Fund or the general state treasury" (Jones, No. 101996, slip op. at 26).

"There can be no serious argument that a $5 fine is so disproportionate to the offense of a possession of a controlled substance so as to violate defendant's substantive due process rights." Jones, No. 101996, slip op. at 26. Thus, this fine was validly imposed on defendant.

Finally, we address defendant's contention that a $20 assessment for the Violent Crime Victim Assistance Fund could not lawfully be applied under the terms of the Violent Crime

-38-

1-04-2469

Victims Assistance Act (725 ILCS 240/1 *et seq*. (West 2004)). The parties agree that the assessment is provided for by the following language from section 10(c)(2) of the Act:

> "When any person is convicted in Illinois on or after August 28, 1986, of an offense listed below, or placed on supervision for such an offense on or after September 18, 1986, *and no other fine is imposed*, the following penalty shall be collected by the Circuit Court Clerk:
>
> ***
>
> (2) $20, for any other felony or misdemeanor, excluding any conservation offense." (Emphasis added). 725 ILCS 240/10(c)(2) (West 2004)

Defendant contends that since controlled substance assessments were imposed as a part of his sentence, and the Act only provides for the $20 to be imposed when "no other fine is imposed," then, under the plain language of the Act, he could not be subject to this additional charge. We agree. Based on our analysis above, derived from our supreme court's holding in Jones, defendant is already subject to multiple, other "fines." Therefore, the Act does not apply to him by its own plain terms.

IV. DNA Extraction

We next address defendant's challenge to the constitutionality of section 5-4-3(a-5) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4-3(a-5) (West 2004)) as an unreasonable search and seizure under the fourth amendment of the federal constitution.

Section 5-4-3(a-5) of the Code provides:

-39-

"Any person who was otherwise convicted of or received a disposition of court supervision for any other offense under the Criminal Code of 1961 or who was found guilty or given supervision for such a violation under the Juvenile Court Act of 1987, may, regardless of the sentence imposed, be required by an order of the court to submit specimens of blood, saliva, or tissue to the Illinois Department of State Police in accordance with the provision of this Section." 730 ILCS 5/5-4-3(a-5) (West 2004).

Defendant asks us to find the search provided for to be unreasonable because it serves no special need aside from general law enforcement. In the alternative, he asks us to find that any special need presented by the State is outweighed by defendant's privacy interests. Our supreme court has recently, directly addressed defendant's contentions in People v. Garvin, 219 Ill. 2d 104 (2006) and rejected his arguments. The Garvin court held that the "main purpose" for the collection of DNA was "to absolve innocents, identify the guilty, deter recidivism by identifying those at a high risk of reoffending, or bring closure to victims," which it found distinct from "traditional law enforcement practices designed to gather evidence in a particular case to solve a specific crime that ha[d] already been committed." Garvin, 219 Ill. 2d at 122. The Garvin court further held that, on balance, the special need of the State outweighed the privacy interests of its defendant both because of the minimal intrusion presented by a blood draw (Garvin, 219 Ill. 2d at 123) and because of the reduced privacy expectations of convicted felons (Garvin, 219 Ill. 2d at 123-24). Therefore, the circuit court's order requiring extraction and storage of defendant's DNA

1-04-2469

was proper.

## V.  Mittimus

Finally, defendant contends that his mittimus incorrectly reflects his conviction for manufacture or delivery of a controlled substance and manufacture or delivery of cannabis when, in fact, he was convicted of possession of a controlled substance with intent to deliver and possession of cannabis with intent to deliver.  The State concedes the error.  We have the authority to correct the mittimus.  See People v. McCray, 273 Ill. App. 3d 396, 403 (1995).  We, therefore, instruct the clerk of the circuit court to correct defendant's mittimus to reflect convictions of possession of a controlled substance with intent to deliver and possession of cannabis with intent to deliver.

## CONCLUSION

For all the foregoing reasons, we affirm the judgment of the circuit court, the order mandating the extraction and storage of defendant's DNA, and the imposition of a fine directed to the Spinal Cord Injury Research Fund.  However, we reverse the imposition of the Violent Crime Victim Assistance Fund fee in his sentence, and remand for recalculation of the drug assessments to factor in his pretrial incarceration credits.  Finally, we order correction of the mittimus.

Affirmed in part, reversed in part, and mittimus corrected, and cause remanded with instructions.

McBRIDE, P.J., and CAHILL, J., concur.

-41-

1-04-2469